[S.F. No. 23222. Dec. 17, 1976.]

ASSOCIATED HOME BUILDERS OF THE GREATER EASTBAY, INC., Plaintiff and Respondent, v. CITY OF LIVERMORE et al., Defendants and Appellants.

**COUNSEL**

Maurice Engel for Defendants and Appellants.

Richard J. Fink as Amicus Curiae on behalf of Defendants and Appellants.

Robert C. Burnstein for Plaintiff and Respondent.

## OPINION

**TOBRINER, J.**—We face today the question of the validity of an initiative ordinance enacted by the voters of the City of Livermore which prohibits issuance of further residential building permits until local educational, sewage disposal, and water supply facilities comply with specified standards.[1] Plaintiff, an association of contractors, subdividers, and other persons interested in residential construction in Livermore, brought this suit to enjoin enforcement of the ordinance. The superior court issued a permanent injunction, and the city appealed.

In *Hurst* v. *City of Burlingame* (1929) 207 Cal. 134 [277 P. 308], we held that statutes requiring notice and hearing to precede enactment of municipal zoning and land use ordinances applied to initiatives, a holding which effectively denied voters of general law cities the power to enact such legislation by initiative. In accord with that precedent, the trial court here held that Livermore, as a general law city, lacked authority to enact the initiative ordinance at issue. We have concluded, however, that *Hurst* was incorrectly decided; the statutory notice and hearing provisions govern only ordinances enacted by city council action and do not limit the power of municipal electors, reserved to them by the state Constitution, to enact legislation by initiative. We therefore reverse the trial court holding on this issue.

We also reject the trial court's alternative holding that the ordinance is unconstitutionally vague. By interpreting the ordinance to incorporate standards established by the Livermore Valley Joint School District and the Regional Water Quality Control Board, we render its terms sufficiently specific to comply with constitutional requisites. The failure of the ordinance to designate the person or agency who determines when its standards have been fulfilled does not make it unconstitutionally vague; the duty to enforce the ordinance reposes in the city's building inspector, whose decisions are subject to judicial review by writ of mandamus.

Finally, we reject plaintiff's suggestion that we sustain the trial court's injunction on the ground that the ordinance unconstitutionally attempts

---

[1]For the history of the events leading to the enactment of the Livermore ordinance see Stanford Environmental Law Society, A Handbook for Controlling Local Growth (1973) pages 90-96; Deutsch, *Land Use Growth Controls: A Case Study of San Jose and Livermore, California* (1974) 15 Santa Clara Law. 1, 12-14.

to bar immigration to Livermore. Plaintiff's contention symbolizes the growing conflict between the efforts of suburban communities to check disorderly development, with its concomitant problems of air and water pollution and inadequate public facilities, and the increasing public need for adequate housing opportunities. We take this opportunity, therefore, to reaffirm and clarify the principles which govern validity of land use ordinances which substantially limit immigration into a community; we hold that such ordinances need not be sustained by a compelling state interest, but are constitutional if they are reasonably related to the welfare of the region affected by the ordinance. Since on the limited record before us plaintiff has not demonstrated that the Livermore ordinance lacks a reasonable relationship to the regional welfare, we cannot hold the ordinance unconstitutional under this standard.

1. *Summary of proceedings.*

The initiative ordinance in question was enacted by a majority of the voters at the Livermore municipal election of April 11, 1972, and became effective on April 28, 1972. The ordinance, set out in full in the margin,[2]

---

[2]The initiative provides as follows:

"INITIATIVE ORDINANCE RE BUILDING PERMITS

"An ordinance to control residential building permits in the City of Livermore:

"A. The people of the City of Livermore hereby find and declare that it is in the best interest of the City in order to protect the health, safety, and general welfare of the citizens of the city, to control residential building permits in the said city. Residential building permits include single-family residential, multiple residential, and trailer court building permits within the meaning of the City Code of Livermore and the General Plan of Livermore. Additionally, it is the purpose of this initiative measure to contribute to the solution of air pollution in the City of Livermore.

"B. The specific reasons for the proposed position are that the undersigned believe that the resulting impact from issuing residential building permits at the current rate results in the following problems mentioned below. Therefore no further residential permits are to be issued by the said city until satisfactory solutions, as determined in the standards set forth, exist to all the following problems:

"1.EDUCATIONAAL FACILITIES—No double sessions in the schools nor over-crowded classrooms as determined by the California Education Code.

"2.SEWAGE—The sewage treatment facilities and capacities meet the standards set by the Regional Water Quality Control Board.

"3.WATER SUPPLY—No rationing of water with respect to human consumption or irrigation and adequate water reserves for fire protection exist.

"C. This ordinance may only be amended or repealed by the voters at a regular municipal election.

"D. If any portion of this ordinance is declared invalid the remaining portions are to be considered valid."

states that it was enacted to further the health, safety, and welfare of the citizens of Livermore and to contribute to the solution of air pollution. Finding that excessive issuance of residential building permits has caused school overcrowding, sewage pollution, and water rationing, the ordinance prohibits issuance of further permits until three standards are met: "1. EDUCATIONAL FACILITIES—No double sessions in the schools nor overcrowded classrooms as determined by the California Education Code. 2. SEWAGE—The .sewage treatment facilities and capacities meet the standards set by the Regional Water Quality Control Board. 3. WATER SUPPLY—No rationing of water with respect to human consumption or irrigation and adequate water reserves for fire protection exist."

Plaintiff association filed suit to enjoin enforcement of the ordinance and for declaratory relief. After the city filed its answer, all parties moved for judgment on the pleadings and stipulated that the court, upon the pleadings and other documents submitted, could determine the merits of the cause. On the basis of that stipulation the court rendered findings and entered judgment for plaintiff. The city appeals from that judgment.

2. *The enactment of the Livermore ordinance by initiative does not violate the state zoning law.*

The superior court found that the initiative ordinance was adopted "without complying with the statutes . . . governing general law cities," specifically Government Code sections 65853 through 65857. These sections provide that any ordinance which changes zoning or imposes a land use restriction listed in Government Code section 65850 can be enacted only after noticed hearing before the city's planning commission and legislative body.[3] The superior court concluded that notice and

---

[3]Government Code section 65853 provides in part that: "A zoning ordinance or an amendment to a zoning ordinance, which amendment changes any property from one zone to another or imposes any regulation listed in Section 65850 not theretofore imposed or removes or modifies any such regulation therefore imposed shall be adopted in the manner set forth in Sections 65854 to 65857, inclusive. Any other amendment to a zoning ordinance may be adopted as other ordinances are adopted." Section 65854 provides for notice and hearing before the planning commission. Section 65855 requires the commission to render a written recommendation to the city legislative body. Section 65856 requires a noticed public hearing before the legislative body. Finally, section 65857 authorizes the city legislative body to approve, modify, or disapprove the ordinance, but provides that no modification of the ordinance not previously considered by the planning commission can be adopted without first referring that matter to the commission.

hearing must precede enactment of any ordinance regulating land use. Since Livermore passed its ordinance pursuant to the procedures specified in the statutes governing municipal initiatives (Elec. Code, § 4000 et seq.), which do not provide for hearings before the city planning commission or council, the court held the ordinance invalid.

The amendment of the California Constitution in 1911 to provide for the initiative and referendum signifies one of the outstanding achievements of the progressive movement of the early 1900's.[4] Drafted in light of the theory that all power of government ultimately resides in the people, the amendment speaks of the initiative and referendum, not as a right granted the people, but as a power reserved by them.[5] Declaring it "the duty of the courts to 'jealously guard this right of the people" (*Martin* v. *Smith* (1959) 176 Cal.App.2d 115, 117 [1 Cal.Rptr. 307]), the courts have described the initiative and referendum as articulating "one of the most precious rights of our democratic process" (*Mervynne* v. *Acker, supra,* 189 Cal.App.2d 558, 563). "[I]t has long been our judicial policy to apply a liberal construction to this power wherever it is challenged in order that the right be not improperly annulled. If doubts can reasonably be resolved in favor of the use of this reserve power, courts will preserve it." (*Mervynne* v. *Acker, supra,* 189 Cal.App.2d 558, 563-564; *Gayle* v. *Hamm, supra,* 25 Cal.App.3d 250, 258.)[6]

The 1911 amendment, in reserving the right of initiative to electors of counties and cities, authorized the Legislature to establish procedures to facilitate the exercise of that right.[7] Accordingly the Legislature enacted

[4]See Note, *The Scope of the Initiative and Referendum in California* (1966) 54 Cal.L.Rev. 1717.

[5]See *Builders Assn. of Santa Clara-Santa Cruz Counties* v. *Superior Court* (1974) 13 Cal.3d 225, 231 [118 Cal.Rptr. 158, 529 P.2d 582]; *Blotter* v. *Farrell* (1954) 42 Cal.2d 804, 809 [270 P.2d 481]; *Ley* v. *Dominguez* (1931) 212 Cal. 587, 593 [299 P. 713]; *Dwyer* v. *City Council* (1927) 200 Cal. 505, 513 [253 P. 932]; *Gayle* v. *Hamm* (1972) 25 Cal.App.3d 250, 258 [101 Cal.Rptr. 628]; *Mervynne* v. *Acker* (1961) 189 Cal.App.2d 558, 563 [11 Cal.Rptr. 340].

[6]See *Farley* v. *Healey* (1967) 67 Cal.2d 325 328 [62 Cal.Rptr. 26, 431 P.2d 650]; *McFadden* v. *Jordan* (1948) 32 Cal.2d 330, 332 [196 P.2d 787]; *Gage* v. *Jordan* (1944) 23 Cal.2d 794, 799 [147 P.2d 387]; cf. *Hunt* v. *Mayor & Council of Riverside* (1948) 31 Cal.2d 619, 628 [191 P.2d 426] (referendum).

[7]The initiative and referendum amendment, formerly article IV, section 1, of the California Constitution, stated in part that "The initiative and referendum powers of the people are hereby further reserved to the electors of each county, city and county, city and town of the State to be exercised under such procedure as may be provided by law. . . . This section is self-executing, but legislation may be enacted to facilitate its operation,

statutes, now codified as sections 4000-4023 of the Election Code, providing for the circulation of petitions, the calling of elections, and other procedures required to enact an initiative measure.

The 1911 amendment was first applied to zoning matters in 1927 in *Dwyer* v. *City Council, supra,* 200 Cal. 505, in which the court mandated the Berkeley City Council to submit a zoning ordinance to referendum. The opinion reasoned that since the city council had the legislative authority to enact zoning ordinances, the people had the power to do so by initiative or referendum. Rejecting an argument that the referendum procedure denied affected persons the right, granted them by municipal ordinance, to appear before the city council and state their views on the ordinance, the court replied that "the matter has been removed from the forum of the Council to the forum of the electorate. The proponents and opponents are given all the privileges and rights to express themselves in an open election that a democracy or republican form of government can afford to its citizens. . . . It is clear that the constitutional right reserved by the people to submit legislative questions to a direct vote cannot be abridged by any procedural requirement. . . ." (200 Cal. at p. 516.)

Two years later the court decided *Hurst* v. *City of Burlingame, supra,* 207 Cal. 134, the decision on which the trial court in the instant case based its ruling. The City of Burlingame had enacted by initiative a city-wide zoning ordinance which classified as residential the property where plaintiff had a retail store. Contending that he had been denied the right to a public hearing established in the Zoning Act of 1917 (Stats. 1917, ch. 734, p. 1419), plaintiff sued to enjoin enforcement of the ordinance. Beginning with the premise that "an ordinance proposed by the electors of a county or of a city in this state under the initiative law must constitute such legislation as the legislative body of such county or city has the power to enact . . . ." (207 Cal. at p. 140), the *Hurst* court reasoned that since the board of trustees of the City of Burlingame could not lawfully enact a zoning ordinance without complying with the hearing requirement of the state law, the voters could not adopt such an ordinance by initiative.

but in no way limiting or restricting either the provisions of this section or the powers herein reserved." This language was repealed in 1966 and replaced by article IV, section 25, which provides that "Initiative and referendum powers may be exercised by the electors of each city or county under procedure that the Legislature shall provide."

Responding to the argument that the enactment of the ordinance complied with the state initiative law, the court stated that "The initiative law and the zoning law are hopelessly inconsistent and in conflict as to the manner of the preparation and adoption of a zoning ordinance. The Zoning Act is a special statute dealing with a particular subject and must be deemed to be controlling over the initiative, which is general in its scope." (P. 141.) Finally, the court distinguished *Dwyer* v. *City Council, supra,* 200 Cal. 505, on the ground that *Dwyer* upheld a referendum, and thus persons affected by the referendum had already been granted a right to notice and hearing at the time of the original enactment of the ordinance. (See p. 142.)

Although *Hurst* thus held the Burlingame initiative invalid for noncompliance with the state zoning law, the court added a constitutional dictum, asserting that "the statutory notice and hearing . . . becomes necessary in order to satisfy the requirements of due process. . . ." (P. 141.) In later years this constitutional dictum overshadowed the statutory holding of *Hurst.* Courts and commentators alike questioned *Hurst's* statutory holding,[8] but reexamination of that holding seemed pointless if the landowner's right to notice and hearing derived from constitutional compulsion independent of statute.[9]

Two years ago, however, in *San Diego Bldg. Contractors Assn.* v. *City Council* (1974) 13 Cal.3d 205, 216 [118 Cal.Rptr. 146, 529 P.2d 570, 72 A.L.R.3d 973] (app. dism. (1976) 427 U.S. 901 [49 L.Ed.2d 1195, 96 S.Ct. 3184]) we expressly disapproved the constitutional dictum of Hurst and later decisions. We held that a city violates no constitutional prohibition in enacting a zoning ordinance without notice and hearing to landowners, and hence may do so by initiative. (13 Cal.3d at pp. 217-218.) That decision clears the way for a long-needed reconsideration of the actual holding of *Hurst* that bars a general law city from enacting a zoning ordinance by initiative.

At first glance it becomes apparent that something must be wrong with the reasoning in *Hurst.* Starting from a premise of equality—that the voters possess only the same legislative authority as does the city

---

[8] See *Taschner* v. *City Council* (1973) 31 Cal.App.3d 48, 65 [107 Cal.Rptr. 214]; *Bayless* v. *Limber* (1972) 26 Cal.App.3d 463, 469, footnote 5 [102 Cal.Rptr. 647]; Hagman et al., California Zoning Practice (Cont.Ed.Bar 1969) page 105.

[9] See discussion in *Taschner* v. *City Council, supra,* 31 Cal.App.3d 48, 65.

council—*Hurst* arrived at the conclusion that only the council and not the voters had the authority to enact zoning measures. Thus in the name of equality *Hurst* decrees inequality. The errors which lead to this non sequitur appear after further analysis.

First, *Hurst,* erroneously contriving a conflict between state zoning statutes and the initiative law, set out to resolve that presumed conflict.[10] No conflict occurs, however; the Legislature never intended the notice and hearing requirements of the zoning law to apply to the enactment of zoning initiatives. (See Comment, *The Initiative and Referendum's Use in Zoning* (1976) 64 Cal.L.Rev. 74, 104-105.) The Legislature plainly drafted the questioned provisions of the zoning law with a view to ordinances adopted by vote of the city council; the provisions merely add certain additional procedural requirements to those already specified in Government Code sections 36931-36939 for the enactment of ordinances in general. Procedural requirements which govern *council* action, however, generally do not apply to initiatives,[11] any more than the provisions of the initiative law govern the enactment of ordinances in council. No one would contend, for example, that an initiative of the people failed because a quorum of councilmen had not voted upon it, any more than one would contend that an ordinary ordinance of a council failed because a majority of voters had not voted upon it.

In the second place, *Hurst,* in treating the case as one involving a conflict between two statutes of equal status—the zoning law and the initiative law—overlooked a crucial distinction: that although the procedures for exercise of the right of initiative are spelled out in the

[10]"The fundamental test as to whether statutes are in conflict with each other is the legislative intent. If it appears that the statutes were designed for different purposes, they are not irreconcilable, and may stand together." (*People* v. *Lustman* (1970) 13 Cal.App.3d 278, 288 [91 Cal.Rptr. 548]; *Rudman* v. *Superior Court* (1973) 36 Cal.App.3d 22, 27 [111 Cal.Rptr. 249].)

[11]See *Blotter* v. *Farrell, supra,* 42 Cal.2d 804; *Bayless* v. *Limber, supra,* 26 Cal.App.3d 463, 469, footnote 5.

In *Galvin* v. *Board of Supervisors* (1925) 195 Cal. 686 [235 P. 450], we held that the County of Contra Costa could not by initiative award a franchise for a toll bridge spanning navigable waters to neighboring Solano County without complying with statutory requirements for advance approval by the state engineer and a public hearing. The exceptional character of the statute involved in *Galvin,* which permitted one county to legislate on a matter which otherwise might require joint action of the state and both the counties affected, but permitted that action only if the legislating county complied with requirements designed to protect the interests of the state and the neighboring county, distinguishes *Galvin* from the present case.

initiative law, the right itself is guaranteed by the Constitution. The 1911 constitutional amendment, in reserving the right of initiative on behalf of municipal voters, stated that "This section is self-executing, but legislation may be enacted to facilitate its operation, *but in no way limiting or restricting* either the provisions of this section or *the powers herein reserved.*" (Former Cal. Const., art. IV, § 1.) (Italics added.)[12] Although the Legislature can specify the manner in which general law cities enact ordinances restricting land use,[13] legislation which permits council action but effectively bars initiative action may run afoul of the 1911 amendment. (See Comment, *op. cit., supra,* 64 Cal.L.Rev. 74, 102.) Thus the notice and hearing provisions of the state zoning law, if interpreted to bar initiative land use ordinances, would be of doubtful constitutionality; all such doubt dissolves in the light of an interpretation which limits those requirements to ordinances enacted by city councils.

The fact that the zoning law is a special statute will not support *Hurst*; special legislation is still subject to constitutional limitations. If, for example, a "special" statute were enacted prohibiting criticism of a named official, such as the Vice-President, it would not be deemed controlling over the First Amendment on the ground that the latter is "general in its scope." Indeed if the constitutional power reserved by the people can be abridged by special statutes, then by enacting a host of special statutes the Legislature could totally abrogate that power.

Finally, *Hurst* erred in distinguishing *Dwyer* v. *City Council, supra,* 200 Cal. 505, on the ground that *Dwyer* involved a referendum on a zoning ordinance; as *Dwyer* itself pointed out, "if the right of referendum can be invoked, the corollary right to initiate legislation must be conceded to exist." (200 Cal. at p. 511.)

---

[12]Article IV of the California Constitution was revised in 1966. The right of municipal initiative now appears in section 25, which states simply that "Initiative and referendum powers may be exercised by the electors of each city or county under procedures that the Legislature shall provide." The 1966 constitutional revision was intended solely to shorten and simplify the Constitution, deleting unnecessary provisions; it did not enact any substantive change in the power of the Legislature and the people. The drafters of the revision expressly stated that they proposed deletion of the clauses barring the Legislature from restricting the reserved power of municipal initiative solely on the ground that it was surplusage, and that the deletion would be made "without, in the end result, changing the meaning of the provisions." (Cal. Const. Revision Com. (1966) Proposed Revision of the Cal. Const., pp. 49-50.)

[13]Article XI, section 2 of the California Constitution authorizes the Legislature to "provide for city powers"; article XI, section 7 states that a "city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations *not in conflict with general laws.*" (Italics added.)

Thus both precedent and established principles of judicial construction dictate the conclusion that *Hurst* erred in holding the notice and hearing provisions of the Zoning Act of 1917 applied to zoning ordinances enacted by initiative. Resting upon the precepts that statutes which are apparently in conflict should, if reasonably possible, be reconciled (see, e.g., *Warne* v. *Harkness* (1963) 60 Cal.2d 579, 588 [35 Cal.Rptr. 601, 387 P.2d 377]; *Pacific Motor Transport Co.* v. *State Bd. of Equalization* (1972) 28 Cal.App.3d 230, 235 [104 Cal.Rptr. 558]); that a statute should be construed to "eliminate . . . doubts as to the provision's constitutionality" (*In re Kay* (1970) 1 Cal.3d 930, 942 [83 Cal.Rptr. 686, 464 P.2d 142]); that the initiative power must be broadly construed, resolving all doubts in favor of the reserved power (see cases cited pp. 591-592, *ante,* and fn. 6), we resolve that *Hurst* v. *Burlingame, supra,* 207 Cal. 134, was incorrectly decided and is therefore overruled.[14]

The notice and hearing provisions of the present zoning law (Gov. Code, §§ 65853-65857), like the provisions of the 1911 law before the *Hurst* court, make no mention of zoning by initiative. The procedures they prescribe refer only to action by the city council, and are inconsistent with the regulations that the Legislature has established to govern enactment of initiatives. For the reasons stated in our discussion of *Hurst* v. *Burlingame, supra,* we conclude that sections 65853-65857 do not apply to initiative action, and that the Livermore ordinance is not invalid for noncompliance with those sections.

3. *The Livermore ordinance is not void for vagueness.*

The trial court found the ordinance unconstitutionally vague on two grounds: (1) that the ordinance did not contain sufficiently specific

---

[14]We also disapprove language in the following decisions which, relying on *Hurst* v. *City of Burlingame, supra,* assert that general law cities cannot adopt zoning ordinances by initiative: *Johnston* v. *City of Claremont* (1958) 49 Cal.2d 826, 837 [323 P.2d 71] (dictum); *Taschner* v. *City Council, supra,* 31 Cal.App.3d 48, 61-65; *People's Lobby, Inc.* v. *Board of Supervisors* (1973) 30 Cal.App.3d 869, 872-873 [106 Cal.Rptr. 666]; *Laguna Beach Taxpayers' Assn.* v. *City Council* (1960) 187 Cal.App.2d 412, 415 [9 Cal.Rptr. 775].

We distinguish those decisions which bar the use of the initiative and referendum in a situation in which the state's system of regulation over a matter of statewide concern is so pervasive as to convert the local legislative body into an administrative agent of the state. (*Housing Authority* v. *Superior Court* (1950) 35 Cal.2d 550 [219 P.2d 457]; *Simpson* v. *Hite* (1950) 36 Cal.2d 125 [222 P.2d 225]; *Riedman* v. *Brison* (1933) 217 Cal. 383 [18 P.2d 947]; cf. *Hughes* v. *City of Lincoln* (1965) 232 Cal.App.2d 741 [43 Cal.Rptr. 306].) In enacting the instant ordinance, the voters of Livermore were acting in a legislative, not an administrative, capacity. (See *San Diego Bldg. Contractors Assn.* v. *City Council, supra,* 13 Cal.3d 205, 212-213, fn. 5.)

standards for the issuance or denial of building permits, and (2) that it did not specify what person or agency was empowered to determine if the ordinance's standards have been met. We disagree with both rationales and find the ordinance sufficiently specific to fulfill constitutional requirements.

The controversy concerning the specificity of the ordinance centers upon the standard as to education. The ordinance prohibits issuance of residential building permits until a "satisfactory solution" has been evolved to the problem of "Educational Facilities;" it defines a satisfactory solution as one characterized by "No double sessions in the schools nor overcrowded classrooms as determined by the California Education Code."

The term "double sessions" is sufficiently specific; as stated by Professor Deutsch, it "can be defined by reference to common practice, since the term is frequently used to refer to a situation where different groups of students in the same grade are attending the same school at different times of the day because of a lack of space." (Deutsch, *op. cit., supra,* pp. 22-23.) The phrase "overcrowded classrooms as determined by the California Education Code," however, is less clear, since nowhere in the Education Code does there appear a definition of "overcrowded classrooms."

The City of Livermore, however, points out that the ordinance does not refer to a definition of "overcrowded classrooms" contained in the Education Code, but to a *determination* of that subject. The language, it contends—and plaintiff does not dispute the contention—was intended to refer to resolution 3220, adopted by the board of the Livermore Valley Joint School District on January 18, 1972, in which that board, pursuant to authority granted it by Education Code section 1052, established clear and specific standards for determining whether schools are overcrowded.[15]

---

[15]Board resolution 3220 provides as follows:
"ADEQUACY OF SCHOOLS
 "1. Sufficient instructional space shall be determined to exist when:
 a. *For elementary schools:*
 (1) All students can be housed in single session classes in affected schools.
 (2) At least 900 square feet of functional instructional area are available for each classroom or teaching station.
 (3) Class sizes average 30 students or less throughout the District.
 b. *For secondary schools:*
 (1) All students can be housed within the capacity of existing schools on

Rather than interpret the ordinance in a manner which would expose it to the charge of unconstitutional vagueness, we adopt the suggestion of the city and construe the ordinance's standard on education to incorporate the specific guidelines established in board resolution 3220. ■ In so doing we conform to the rule that enactments should be interpreted when possible to uphold their validity (see *San Francisco Unified School Dist.* v. *Johnson* (1971) 3 Cal.3d 937, 948 [92 Cal.Rptr. 309, 479 P.2d 669]), and the corollary principle that courts should construe enactments to give specific content to terms that might otherwise be unconstitutionally vague. (See *Bloom* v. *Municipal Court* (1976) 16 Cal.3d 71 [127 Cal.Rptr. 317, 545 P.2d 229]; *In re Kay, supra,* 1 Cal.3d 930.)

Our decision in *Braxton* v. *Municipal Court* (1973) 10 Cal.3d 138 [109 Cal.Rptr. 897, 514 P.2d 697], illustrates the principle and provides a close analogy to the present case. In *Braxton,* we construed Penal Code section 626.4, which authorized a state college or university to bar from its campus anyone who had "disrupted" the orderly operation of the campus. Defendants argued that the term "disrupted" was unconstitutionally vague. We determined, however, that the Legislature had intended to authorize banishment only of persons who had violated other more specific criminal statutes. Although section 626.4 did not expressly refer to such other statutes, we interpreted section 626.4 to incorporate the specific standards set out in those statutes in order to uphold the constitutionality of the section. (10 Cal.3d at p. 152.)

■ Following the course suggested by *Braxton,* we construe the Livermore ordinance to incorporate the standards for determining the

regular day session. Capacity will be determined by applying State Department of Education criteria in keeping with Maximum class size.

"2. Minimum support services exist when:
 a. Sufficient shelf and cabinet space is provided to accommodate books and equipment normally associated with a classroom.
 b. A faculty workroom exists.
 c. Off-street parking for 1½ cars per teaching station is provided.
 d. Sufficient playground area and playground equipment is provided to support outdoor play activity.
 e. Sufficient furniture and equipment for each classroom to accommodate all students and teachers.
 f. A library is established equivalent to at least one classroom for each 600 students.

"3. School construction and outfitting, in terms of classroom space, architectural layout, space relationship, outdoor facilities, utilities, grounds development, and furniture and equipment, shall meet or exceed State Bureau of Education standards."

overcrowded condition of schools contained in the school board resolution of January 18, 1972. So construed, the ordinance provides a clear and ascertainable educational standard to guide the issuance or denial of a building permit, and is not void for vagueness.

The ordinance's standards relating to sewage and water supply present no constitutional difficulties. The sewage provision incorporates the "standards set by the Regional Water Quality Control Board;" that agency has in fact established specific and detailed standards of water purification and sewage disposal.[16] The water supply provision describes a "satisfactory solution" as one in which water is not rationed, and "adequate water reserves for fire protection exist." The existence of rationing is an objective fact which can be ascertained by inquiry to the agencies having authority to ration.[17] Although individuals may differ as to the adequacy of reserves for fire protection, the considered judgment of the agencies responsible for fire protection would provide a reliable guide.

Although we have determined that the ordinance's standards meet constitutional requirements of certainty, plaintiff argues, and the trial court held, that the ordinance is void because it fails to designate what agency or person determines whether these standards have been achieved. We question plaintiff's underlying assumption that an ordinance or statute is void if it does not specify on its face the agency that is to adjudge disputes concerning its application; by such a test most of the civil and criminal laws of this state would be invalidated. In any event, we believe that the Livermore ordinance, read in the light of the structure of Livermore's city government and the applicable judicial decisions, does indicate the method by which disagreements concerning the ordinance's standards are resolved.

The Livermore ordinance establishes standards to govern the issuance or denial of residential building permits. These standards must be

---

[16]A statute otherwise uncertain "will be upheld if its terms may be made reasonably certain by reference to other definable sources." (*American Civil Liberties Union* v. *Board of Education* (1963) 59 Cal.2d 203, 218 [28 Cal.Rptr. 700, 379 P.2d 4].)

[17]Professor Deutsch has suggested that absence of rationing is not a realistic measure of the adequacy of water supplies in Northern California where seasonal scarcity often requires rationing. (Deutsch, *op. cit., supra,* 15 Santa Clara Law. 1, 23.) Plaintiffs in the present case, however, do not contend that the standards established in the ordinance are arbitrary or unreasonable.

directed in the first instance to the city building inspector, the official charged with the duty of issuing or denying such permits. Since the duties of this official are ministerial in character, his decisions can be reviewed by writ of mandamus. (*McCombs* v. *Larson* (1959) 176 Cal.App.2d 105, 107 [1 Cal.Rptr. 140]; *Palmer* v. *Fox* (1953) 118 Cal.App.2d 453 [258 P.2d 30].) Thus the ultimate decision as to compliance with the standards will be rendered by the courts. (See generally Hagman et al., Cal. Zoning Practice (Cont.Ed.Bar 1969) § 12.4.)

4. *On the limited record before us, plaintiff cannot demonstrate that the Livermore ordinance is not a constitutional exercise of the city's police power.*

Plaintiff urges that we affirm the trial court's injunction on a ground which it raised below, but upon which the trial court did not rely. Plaintiff contends that the ordinance proposes, and will cause, the prevention of nonresidents from migrating to Livermore, and that the ordinance therefore attempts an unconstitutional exercise of the police power, both because no compelling state interest justifies its infringement upon the migrant's constitutionally protected right to travel, and because it exceeds the police power of the municipality.[18]

The ordinance on its face imposes no absolute prohibition or limitation upon population growth or residential construction. It does provide that no building permits will issue unless standards for educational facilities, water supply and sewage disposal have been met, but plaintiff presented no evidence to show that the ordinance's standards were unreasonable or unrelated to their apparent objectives of protecting the public health and welfare. Thus, we do not here confront the question of the constitutionality of an ordinance which limits or bars population growth either directly in express language or indirectly by the imposition of prohibitory standards; we adjudicate only the validity of

---

[18]Plaintiff does not contend that the ordinance constitutes an inverse condemnation of property (compare *Associated Home Builders, etc., Inc.* v. *City of Walnut Creek* (1971) 4 Cal.3d 633 [94 Cal.Rptr. 630, 484 P.2d 606, 43 A.L.R.3d 847]), that it unreasonably burdens interstate commerce (compare *Construction Ind. Ass'n., Sonoma Cty.* v. *City of Petaluma* (9th Cir. 1975) 522 F.2d 897, 909) or that it denies the equal protection of the laws either to landowners (compare *Town of Los Altos Hills* v. *Adobe Creek Properties, Inc.* (1973) 32 Cal.App.3d 488 [108 Cal.Rptr. 271]) or to migrants (compare *Ybarra* v. *City of Town of Los Altos Hills* (9th Cir. 1974) 503 F.2d 250).

an ordinance limiting building permits in accord with standards that reasonably measure the adequacy of public services.

As we shall explain, the limited record here prevents us from resolving that constitutional issue. ▪ We deal here with a case in which a land use ordinance is challenged solely on the ground that it assertedly exceeds the municipality's authority under the police power; the challenger eschews any claim that the ordinance discriminates on a basis of race or wealth. Under such circumstances, we view the past decisions of this court and the federal courts as establishing the following standard: the land use restriction withstands constitutional attack if it is fairly debatable that the restriction in fact bears a reasonable relation to the general welfare. ▪ For the guidance of the trial court we point out that if a restriction significantly affects residents of surrounding communities, the constitutionality of the restriction must be measured by its impact not only upon the welfare of the enacting community, but upon the welfare of the surrounding region. We explain the process by which the court can determine whether or not such a restriction reasonably relates to the regional welfare. ▪ Since the record in the present case is limited to the pleadings and stipulations, and is devoid of evidence concerning the probable impact and duration of the ordinance's restrictions, we conclude that we cannot now adjudicate the constitutionality of the ordinance. Thus we cannot sustain the trial court judgment on the ground that the ordinance exceeds the city's authority under the police power; that issue can be resolved only after trial.

We turn now to consider plaintiff's arguments in greater detail. Seeking to capitalize upon the absence of an evidentiary record, plaintiff contends that the challenged ordinance must be subjected to strict judicial scrutiny; that it can be sustained only upon a showing of a compelling interest, and that the city has failed to make that showing.

Many writers have contended that exclusionary land use ordinances tend primarily to exclude racial minorities and the poor, and on that account should be subject to strict judicial scrutiny. (See, e.g., Davidoff & Davidoff, *Opening the Suburbs: Toward Inclusionary Land Use Controls* (1971) 22 Syracuse L.Rev. 509; Sager, *Tight Little Islands: Exclusionary Zoning, Equal Protection, and the Indigent* (1969) 21 Stan.L.Rev. 767; Note, *Phased Zoning: Regulation of the Tempo and Sequence of Land Development,* 26 Stan.L.Rev. 585, 597, fn. 45 and authorities there cited;

Note, *The Equal Protection Clause and Exclusionary Zoning after Valtierra and Dandridge* (1971) 81 Yale L.J. 61.) These writers, however, are concerned primarily with ordinances which ban or limit less expensive forms of housing while permitting expensive single family residences on large lots. The Livermore ordinance is not made from this mold; it impartially bans all residential construction, expensive or inexpensive. Consequently plaintiff at bar has eschewed reliance upon any claim that the ordinance discriminates on a basis of race or wealth.

 Plaintiff's contention that the Livermore ordinance must be tested by a standard of strict scrutiny, and can be sustained only upon a showing of a compelling state interest, thus rests solely on plaintiff's assertion that the ordinance abridges a constitutionally protected right to travel. As we shall explain, however, the indirect burden imposed on the right to travel by the ordinance does not warrant application of the plaintiff's asserted standard of "compelling interest."[19]

In asserting that legislation which burdens a right to travel requires strict scrutiny, and can be sustained only upon proof of compelling need, plaintiff relies on recent decisions of this court (*In re King* (1970) 3 Cal.3d 226 [90 Cal.Rptr. 15, 474 P.2d 983]) and the United States Supreme Court (*Memorial Hospital* v. *Maricopa County* (1974) 415 U.S. 250 [39 L.Ed.2d 306, 94 S.Ct. 1076]; *Dunn* v. *Blumstein* (1972) 405 U.S. 330 [31 L.Ed.2d 274, 92 S.Ct. 995]; *Shapiro* v. *Thompson* (1969) 394 U.S. 618 [22 L.Ed.2d 600, 89 S.Ct. 1322]). The legislation held invalid by those decisions, however, directly burdened the right to travel by distinguishing between nonresidents or newly arrived residents on the one hand and established residents on the other, and imposing penalties or disabilities on the former group.[20]

Both the United States Supreme Court and this court have refused to apply the strict constitutional test to legislation, such as the present

[19]For analysis of the constitutional origins of the right to travel, see Note, *Municipal Self-Determination: Must Local Control of Growth Yield to Travel Rights?* (1975) 17 Ariz.L.Rev. 145, 148-152.

[20]*In re King* struck down a penal code provision which declared that failure of a father to support his child was a misdemeanor when the father was a California resident, but decreed that it was a felony when the father resided out of the state. The United States Supreme Court cases overturned residency requirements imposed to restrict eligibility for medical care (*Memorial Hospital* v. *Maricopa County*), voting (*Dunn* v. *Blumstein*), or welfare (*Shapiro* v. *Thompson*). For analysis of these decisions, see generally Comment, *A Strict Scrutiny of the Right to Travel* (1975) 22 U.C.L.A. L.Rev. 1129.)

ordinance, which does not penalize travel and resettlement ·but merely makes it more difficult for the outsider to establish his residence in the place of his choosing.[21] (See *Village of Belle Terre* v. *Boraas* (1973) 416 U.S. 1, 7 [39 L.Ed.2d 797, 803, 94 S.Ct. 1536]; *Ector* v. *City of Torrance* (1973) 10 Cal.3d 129, 135 [109 Cal.Rptr. 849, 514 P.2d 433]; see also *McCarthy* v. *Philadelphia Civil Serv. Comm'n* (1976) 424 U.S. 645 [47 L.Ed.2d 366, 96 S.Ct. 1154]; *Construction Ind. Ass'n, Sonoma Cty.* v. *City of Petaluma, supra,* 522 F.2d 897, 906-907, fn. 13; Note, 50 N.Y.U.L.F. (1975) 1163, 1168.) The only contrary authority, the decision of the federal district court in *Construction Ind. Ass'n, Sonoma Cty.* v. *City of Petaluma* (N.D.Cal. 1974) 375 F.Supp. 574 holding that an ordinance limiting residential construction must be supported· by a compelling state interest has now been reversed by the Court of Appeals for the Ninth Circuit. (*Construction Ind. Ass'n, Sonoma Cty.* v. *City of Petaluma, supra,* 522 F.2d 897, cert. den., 424 U.S. 934 [47 L.Ed.2d 342, 96 S.Ct. 1148].)

Most zoning and land use ordinances affect population growth and density. (See *Construction Ind. Ass'n, Sonoma Cty* v. *City of Petaluma, supra,* 522 F.2d 897, 906; Note, *op. cit., supra,* 26 Stan.L.Rev. 585, 606-607, fn. 91.) As commentators have observed, to insist that such zoning laws are invalid unless the interests supporting the exclusion are compelling in character, and cannot be achieved by an alternative method, would result in wholesale invalidation of land use controls and endanger the validity of city and regional planning. (See Note, *op. cit., supra,* 26 Hastings L.J. 849, 854.) "Were a court to . . . hold that an inferred right of any group to live wherever it chooses might not be abridged without some compelling state interest, the law of zoning would be literally turned upside down; presumptions of validity would become presumptions of invalidity and traditional police powers of a state would be severely circumscribed." (Comment, *Zoning, Communes and Equal Protection,* 1973 Urban L.Ann. 319, 324.)

We conclude that the indirect burden upon the right to travel imposed by the Livermore ordinance does not call for strict judicial scrutiny. The validity of the challenged ordinance must be measured by the more

---

[21]For discussion of the application of the right to travel to land use regulations see Comment, *The Right to Travel: Another Constitutional Standard for Local Land Use Regulations?* (1972) 39 U.Chi.L.Rev. 612; Note, *The Right to Travel and Exclusionary Zoning* (1975) 26 Hastings L.J. 849.

liberal standards that have traditionally tested the validity of land use restrictions enacted under the municipal police power.[22]

This conclusion brings us to plaintiff's final contention: that the Livermore ordinance exceeds the authority conferred upon the city under the police power. The constitutional measure by which we judge the validity of a land use ordinance that is assailed as exceeding municipal authority under the police power dates in California from the landmark decision in *Miller* v. *Board of Public Works* (1925) 195 Cal. 477 [234 P. 381, 38 A.L.R. 1479]. Upholding a Los Angeles ordinance which excluded commercial and apartment uses from certain residential zones, we declared that an ordinance restricting land use was valid if it had a "real or substantial relation to the public health, safety, morals or general welfare." (195 Cal. at p. 490.) A year later the United States Supreme Court, in the landmark case of *Euclid* v. *Ambler Co.* (1926) 272 U.S. 365 [71 L.Ed. 303, 47 S.Ct. 114, 54 A.L.R. 1016], adopted the same test, holding that before a zoning ordinance can be held unconstitutional, "it must be said . . . that [its] provisions are clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." (272 U.S. at p. 395 [71 L.Ed. at p. 314].) Later California decisions confirmed that a land use restriction lies within the public power if it has a "reasonable relation to the public welfare." (*Lockard* v. *City of Los Angeles* (1949) 33 Cal.2d 453, 461 [202 P.2d 38, 7 A.L.R.2d 990]; *Hamer* v. *Town of Ross* (1963) 59 Cal.2d 776, 783 [31 Cal.Rptr. 335, 382 P.2d 375]; see *Town of Los Altos Hills* v. *Adobe Creek Properties, Inc., supra,* 32 Cal.App.3d 488, 508-509 and cases there cited.)

In deciding whether a challenged ordinance reasonably relates to the public welfare, the courts recognize that such ordinances are presumed

[22]In *Village of Belle Terre* v. *Boraas, supra,* 416 U.S. 1 [39 L.Ed.2d 797], appellants assailed an ordinance which prohibited three or more unrelated persons from living in a single household on the ground, among others, that it violated appellants' right to travel. Stating that the ordinance "is not aimed at transients" (p. 7 [39 L.Ed.2d at p. 803]), the majority rejected that contention, and applied a rational relationship test to uphold the challenged ordinance. Justice Marshall, dissenting, stated that a municipality may properly undertake to restrict uncontrolled growth and to maintain a community attractive to families. He asserted, however, that the Belle Terre ordinance in question infringed appellants' fundamental rights of association and privacy, and thus must be judged by the stricter compelling interest test.

. Thus both the majority and the dissenting opinion in *Boraas* support our conclusion that an ordinance which has the effect of limiting migration to a community does not

to be constitutional, and come before the court with every intendment in their favor. (*Lockard* v. *City of Los Angeles, supra*, 33 Cal.2d 453, 460.) "The courts may differ with the zoning authorities as to the 'necessity or propriety of an enactment,' but so long as it remains a 'question upon which reasonable minds might differ,' there will be no judicial interference with the municipality's determination of policy." (*Clemons* v. *City of Los Angeles* (1950) 36 Cal.2d 95, 98 [222 P.2d 439].) In short, as stated by the Supreme Court in *Euclid* v. *Ambler Co., supra*, "If the validity . . . be fairly debatable, the legislative judgment must be allowed to control." (272 U.S. 365, 388 [71 L.Ed. 303, 311].)

Recent decisions of the United States Supreme Court and the Court of Appeals for the Ninth Circuit have applied this liberal standard and, deferring to legislative judgment, have upheld ordinances attacked as exclusionary. In *Village of Belle Terre* v. *Boraas, supra*, 416 U.S. 1 [39 L.Ed.2d 797], the court sustained an ordinance which banned all multiple family housing. The majority opinion by Justice Douglas found a rational basis for the ordinance in the community's desire to preserve a pleasant environment; "[t]he police power," he asserted, "is not confined to the elimination of filth, stench, and unhealthy places. It is ample to lay out zones where family values, youth values, and the blessings of quiet seclusion and clean air make the area a sanctuary for people." (416 U.S. at p. 9 [39 L.Ed.2d at p. 804].) In dissent, Justice Marshall argued that the village's exclusion of groups of three or more unrelated persons from living in a single residence violated protected rights of privacy and association. He agreed, however, that the village could properly enact ordinances to control population density and restrict uncontrolled growth so long as it did not abridge fundamental rights, and that in reviewing such ordinances the courts should defer to the legislative judgment. (See 416 U.S. at pp. 13, 19-20 [39 L.Ed.2d at pp. 806, 810-811].)

In *Construction Ind. Ass'n, Sonoma Cty.* v. *City of Petaluma, supra*, 522 F.2d 897, the Ninth Circuit Court of Appeals upheld a city ordinance fixing a housing development growth rate of 500 units per year. Relying largely on *Belle Terre* v. *Boraas, supra*, 416 U.S. 1 [39 L.Ed.2d 797], the court concluded that "the concept of public welfare is sufficiently broad

---

necessarily abridge a fundamental right to travel, and thus should not be examined by the compelling interest standard unless it infringes some other fundamental right or discriminates on a suspect basis.

to uphold Petaluma's desire to preserve its small town character, its open space and low density of population, and to grow at an orderly and deliberate pace." (522 F.2d at pp. 908-909.) The Supreme Court denied certiorari. (424 U.S. 934 [47 L.Ed.2d 342, 96 S.Ct. 1148].)

We conclude from these federal decisions that when an exclusionary ordinance is challenged under the federal due process clause, the standard of constitutional adjudication remains that set forth in *Euclid* v. *Ambler Co., supra,* 272 U.S. 365 [71 L.Ed. 303]: if it is fairly debatable that the ordinance is reasonably related to the public welfare, the ordinance is constitutional. A number of recent decisions from courts of other states, however, have declined to accord the traditional deference to legislative judgment in the review of exclusionary ordinances, and ruled that communities lacked authority to adopt such ordinances. Plaintiff urges that we apply the standards of review employed in those decisions in passing upon the instant ordinance.

The cases cited by plaintiff, however, cannot serve as a guide to resolution of the present controversy. Not only do those decisions rest, for the most part, upon principles of state law inapplicable in California, but, unlike the present case, all involve ordinances which impede the ability of low or moderate income persons to immigrate to a community but permit largely unimpeded entry by wealthier persons.[23]

[23]The most recent of these decisions, *So. Burlington Cty. N.A.A.C.P.* v. *Tp. of Mt. Laurel* (1975) 67 N.J. 151 [336 A.2d 713], invalidated a township zoning ordinance which discriminated against low and moderate cost housing. The court based its decision upon an extensive trial record which convinced the court that deference to local legislative bodies would impede measures it found essential to the regional welfare. In *National Land and Investment Co.* v. *Kohn* (1965) 419 Pa. 504 [215 A.2d 597], the Pennsylvania Supreme Court, striking down a four-acre minimum lot requirement, independently determined that the zoning ordinance would not promote the general welfare; as we explain in text, California courts do not claim the authority to invalidate ordinances that they believe undesirable so long as it is fairly debatable that the ordinance is reasonably related to the public welfare. *Appeal of Kit-Mar Builders, Inc.* (1970) 439 Pa. 466 [268 A.2d 765] followed *National Land* in striking down a two- and three-acre zoning law. *Appeal of Girsh* (1970) 437 Pa. 237 [263 A.2d 395] invoked the doctrine that a community cannot totally exclude a lawful enterprise, a doctrine rejected in California. (See *Town of Los Altos Hills* v. *Adobe Creek Properties, Inc., supra,* 32 Cal.App.3d 488.) The two-acre zoning law in *Board of County Sup'rs of Fairfax County* v. *Carper* (1959) 200 Va. 653 [107 S.E.2d 390], was held invalid as an arbitrary attempt to exclude low income persons from the western two-thirds of the county. *Bristow* v. *City of Woodhaven* (1971) 35 Mich.App. 205 [192 N.W.2d 322], and other Michigan cases cited rest on a unique Michigan doctrine which presumes the unconstitutionality of ordinances restricting certain favored uses of land. The other cases cited by plaintiff (*Albrecht Realty Company* v. *Town of New Castle* (1957) 8 Misc.2d 255 [167 N.Y.S.2d 843]; *Baltimore Planning Com'n* v. *Victor Development Co.* (1971) 261 Md. 387 [275 A.2d 478]; *Beach* v. *Planning and Zoning*

We therefore reaffirm the established constitutional principle that a local land use ordinance falls within the authority of the police power if it is reasonably related to the public welfare. Most previous decisions applying this test, however, have involved ordinances without substantial effect beyond the municipal boundaries. The present ordinance, in contrast, significantly affects the interests of nonresidents who are not represented in the city legislative body and cannot vote on a city initiative. We therefore believe it desirable for the guidance of the trial court to clarify the application of the traditional police power test to an ordinance which significantly affects nonresidents of the municipality.

When we inquire whether an ordinance reasonably relates to the public welfare, inquiry should begin by asking *whose* welfare must the ordinance serve. In past cases, when discussing ordinances without significant effect beyond the municipal boundaries, we have been content to assume that the ordinance need only reasonably relate to the welfare of the enacting municipality and its residents. But municipalities are not isolated islands remote from the needs and problems of the area in which they are located; thus an ordinance, superficially reasonable from the limited viewpoint of the municipality, may be disclosed as unreasonable when viewed from a larger perspective.

These considerations impel us to the conclusion that the proper constitutional test is one which inquires whether the ordinance reasonably relates to the welfare of those whom it significantly affects. If its impact is limited to the city boundaries, the inquiry may be limited accordingly; if, as alleged here, the ordinance may strongly influence the supply and distribution of housing for an entire metropolitan region, judicial inquiry must consider the welfare of that region.[24]

As far back as *Euclid* v. *Ambler Co.,* courts recognized "the possibility of cases where the general public interest would so far outweigh the interest of the municipality that the municipality would not be allowed to stand in the way." (272 U.S. 365, 390 [71 L.Ed. 303, 311].) More recently, in *Scott* v. *City of Indian Wells* (1972) 6 Cal.3d 541 [99 Cal.Rptr.

---

*Commission* (1954) 141 Conn. 719 [103 A.2d 814]) merely hold that the zoning ordinance in question exceeds the powers granted local zoning authorities under the laws of those states.

[24]In ascertaining whether a challenged ordinance reasonably relates to the regional welfare, the extent and bounds of the region significantly affected by the ordinance should be determined as a question of fact by the trial court.

745, 492 P.2d 1137], we stated that "To hold . . . that defendant city may zone the land within its border without any concern for [nonresidents] would indeed 'make a fetish out of invisible municipal boundary lines and a mockery of the principles of zoning.'" (P. 548.) The New Jersey Supreme Court summed up the principle and explained its doctrinal basis: "[I]t is fundamental and not to be forgotten that the zoning power is a police power of the state and the local authority is acting only as a delegate of that power and is restricted in the same manner as is the state. So, when regulation does have a substantial external impact, the welfare of the state's citizens beyond the borders of the particular municipality cannot be disregarded and must be recognized and served." (*So. Burlington Cty. N.A.A.C.P.* v. *Tp. of Mt. Laurel, supra,* 336 A.2d 713, 726.)[25]

 We explain the process by which a trial court may determine whether a challenged restriction reasonably relates to the regional welfare. The first step in that analysis is to forecast the probable effect and duration of the restriction. In the instant case the Livermore ordinance posits a total ban on residential construction, but one which terminates as soon as public facilities reach specified standards. Thus to evaluate the impact of the restriction, the court must ascertain the extent to which public facilities currently fall short of the specified standards, must inquire whether the city or appropriate regional agencies have undertaken to construct needed improvements, and must determine when the improvements are likely to be completed.

 The second step is to identify the competing interests affected by the restriction. We touch in this area deep social antagonisms. We allude to the conflict between the environmental protectionists and the egalitarian humanists; a collision between the forces that would save the benefits of nature and those that would preserve the opportunity of people in general to settle. Suburban residents who seek to overcome problems of inadequate schools and public facilities to secure "the blessing of quiet seclusion and clean air" and to "make the area a sanctuary for people" (*Village of Belle Terre* v. *Boraas, supra,* 416 U.S. 1,

[25]See also *Golden* v. *Planning Board of Town of Ramapo* (1972) 30 N.Y.2d 359 [334 N.Y.S.2d 138, 285 N.E.2d 291, 300]; Walsh, *Are Local Zoning Bodies Required by the Constitution to Consider Regional Needs?* (1971) 3 Conn.L.Rev. 244; Williams & Doughty, *Studies in Legal Realism: Mount Laurel, Belle Terre and Berman* (1975) 29 Rutgers L.Rev. 73; Note *op. cit. supra,* 26 Stan.L.Rev. 585, 606-608; Stanford Environmental Law Society, A Handbook for Controlling Local Growth (1973) page 16.

9 [39 L.Ed.2d 797, 804]) may assert a vital interest in limiting immigration to their community. Outsiders searching for a place to live in the face of a growing shortage of adequate housing, and hoping to share in the perceived benefits of suburban life, may present a countervailing interest opposing barriers to immigration.

Having identified and weighed the competing interests, the final step is to determine whether the ordinance, in light of its probable impact, represents a reasonable acommodation of the competing interests.[26] We do not hold that a court in inquiring whether an ordinance reasonably relates to the regional welfare, cannot defer to the judgment of the municipality's legislative body.[27] But judicial deference is not judicial abdication. ■■■ The ordinance must have a *real and substantial* relation to the public welfare. (*Miller* v. *Board of Public Works, supra,* 195 Cal. 477, 490.) There must be a reasonable basis in fact, not in fancy, to support the legislative determination. (*Consolidated Rock Products Co.* v. *City of Los Angeles* (1962) 57 Cal.2d 515, 522 [20 Cal.Rptr. 638, 370 P.2d 342].) ■■■ Although in many cases it will be "fairly debatable" (*Euclid* v. *Ambler Co., supra,* 272 U.S. 365, 388 [71 L.Ed. 303, 311]) that the ordinance reasonably relates to the regional welfare, it cannot be assumed that a land use ordinance can *never* be invalidated as an enactment in excess of the police power.

The burden rests with the party challenging the constitutionality of an ordinance to present the evidence and documentation which the court will require in undertaking this constitutional analysis. ■■■ Plaintiff in the present case has not yet attempted to shoulder that burden.

---

[26]For example, in upholding a city ordinance requiring a subdivider to dedicate land for park purposes, we stated in *Associated Home Builders etc., Inc.* v. *City of Walnut Creek* (1971) 4 Cal.3d 633 [94 Cal.Rptr. 630, 484 P.2d 606, 43 A.L.R.3d 847] that the risk that increased development costs could exclude economically depressed persons could be "balanced against the phenomenon of the appallingly rapid disappearance of open areas in and around our cities." (4 Cal.3d at p. 648.)

[27]The reconciliation and accommodation of the competing interests can reasonably take a variety of forms, depending upon the needs and characteristics of the community and its surrounding region. Courts have upheld restrictive zoning ordinances of limited duration (see *Builders Assn. of Santa Clara-Santa Cruz Counties* v. *Superior Court* (1974) 13 Cal.3d 225 [118 Cal.Rptr. 158, 529 P.2d 582] (app. dism. (1976) 427 U.S. 901 [49 L.Ed.2d 1195, 96 S.Ct. 3184]; *Metro Realty* v. *County of El Dorado* (1963) 222 Cal.App.2d 508 [35 Cal.Rptr. 480]), an ordinance aimed at diverting growth to less impacted areas of a city (*Builders Assn. of Santa Clara-Santa Cruz Counties* v. *Superior Court, supra*), and phased growth ordinances (see *Construction Ind. Ass'n, Sonoma Cty.* v. *City of Petaluma, supra,* 522 F.2d 897; *Golden* v. *Planning Board of Town of Ramapo* (1972) 30 N.Y.2d 359 [334 N.Y.S.2d 138, 285 N.E.2d 291].)

Although plaintiff obtained a stipulation that as of the date of trial the ordinance's goals had not been fulfilled, it presented no evidence to show the likely duration or effect of the ordinance's restriction upon building permits. We must presume that the City of Livermore and appropriate regional agencies will attempt in good faith to provide that community with adequate schools, sewage disposal facilities, and a sufficient water supply; plaintiff, however, has not presented evidence to show whether the city and such agencies have undertaken to construct the needed improvements or when such improvements will be completed. Consequently we cannot determine the impact upon either Livermore or the surrounding region of the ordinance's restriction on the issuance of building permits pending achievement of its goals.

With respect to the competing interests, plaintiff asserts the existence of an acute housing shortage in the San Francisco Bay Area, but presents no evidence to document that shortage or to relate it to the probable effect of the Livermore ordinance. Defendants maintain that Livermore has severe problems of air pollution and inadequate public facilities which make it reasonable to divert new housing, at least temporarily, to other communities but offer no evidence to support that claim. Without an evidentiary record to demonstrate the validity and significance of the asserted interests, we cannot determine whether the instant ordinance attempts a reasonable accommodation of those interests.

In short, we cannot determine on the pleadings and stipulations alone whether this ordinance reasonably relates to the general welfare of the region it affects. The ordinance carries the presumption of constitutionality; plaintiff cannot overcome that presumption on the limited record before us. Thus the judgment rendered on this limited record cannot be sustained on the ground that the initiative ordinance falls beyond the proper scope of the police power.

5. *Conclusion.*

For the reasons we have explained, the Livermore ordinance is neither invalid on the ground that it was enacted by initiative nor unconstitutional by reason of vagueness. The more difficult question whether the measure is one which reasonably relates to the welfare of the region affected by its exclusionary impact, and thus falls within the police power of the city, cannot be decided on the limited record here. That issue can

only be resolved by a trial at which evidence is presented to document the probable impact of the ordinance upon the municipality and the surrounding region.

The judgment of the superior court is reversed, and the cause remanded for further proceedings consistent with the views expressed herein.

Wright, C. J., McComb, J., Sullivan, J., and Richardson, J., concurred.

**CLARK, J.**—I dissent.

The zoning provisions of our law applicable to general law cities and the initiative provisions are clearly in conflict as recognized in *Hurst* v. *City of Burlingame* (1929) 207 Cal. 134 [277 P. 308]. A long line of decisions by this court and the Courts of Appeal has followed *Hurst.* (E.g., *Johnston* v. *City of Claremont* (1958) 49 Cal.2d 826, 836-837 [323 P.2d 71]; *Simpson* v. *Hite* (1950) 36 Cal.2d 125, 134 [222 P.2d 225]; *Taschner* v. *City Council* (1973) 31 Cal.App.3d 48, 61 et seq. [107 Cal.Rptr. 214]; *Laguna Beach Taxpayers' Assn.* v. *City Council* (1960) 187 Cal.App.2d 412, 415 [9 Cal.Rptr. 775]; see *San Diego Bldg. Contractors Assn.* v. *City Council* (1974) 13 Cal.3d 205, 215 [118 Cal.Rptr. 146, 529 P.2d 570, 72 A.L.R.3d 973].) Until today, it was held that because of the conflict general law cities' zoning ordinances were not subject to enactment by initiative. The rationale was: the statute conferring upon the legislative body the power to enact zoning prescribes the enactment method thereby establishing the measure of the power to enact; where a state act specifies the steps to be followed by the local body in enacting legislation, the initiative could not be used unless the steps were taken, and the steps required for zoning ordinances could not be followed within the initiative process. (*Id.*) The reasoning is compelling and indeed conclusive; I would not overrule *Hurst* and the numerous cases following it.

When we look at constitutional and statutory provisions governing zoning, related matters, and initiative process, the conflict is apparent.

## ZONING

As pointed out in *Hurst,* a general law city is limited in the exercise of its powers by the Constitution and the general laws. (207 Cal. at p. 138;

see *Bishop* v. *City of San Jose* (1969) 1 Cal.3d 56, 61 [81 Cal.Rptr. 465, 460 P.2d 137].) The power of a general law city to zone is derived from article XI, section 11: "A county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations *not in conflict with general laws.*" (Italics added; *Miller* v. *Board of Public Works* (1925) 195 Cal. 477 [234 P. 381, 38 A.L.R. 1479], 483; *People* v. *Johnson* (1955) 129 Cal.App.2d 1, 5 [277 P.2d 45].)[1]

The Legislature has specifically authorized general law cities and counties to adopt zoning ordinances, enumerating many of the types of zoning regulations. (Gov. Code, §§ 65800, 65850.) Government Code section 65802 provides that the procedures for enactment of zoning laws are exclusive: "No provisions of this code, other than the provisions of this chapter, and no provisions of any other code or statute shall restrict or limit the procedures provided in this chapter by which the legislative body of any county or city enacts, amends, administers, or provides for the administration of any zoning law, ordinance, rule or regulation."

The Legislature has expressly provided that a zoning ordinance changing property from one zone to another or imposing or removing any of the numerous regulations set forth in Government Code section 65850 shall be adopted in the manner specified in sections 65854 to 65857 inclusive. (Gov. Code, § 65853.)

The procedure established provides for notice and hearing by the planning commission, a written report and recommendation by the planning commission including specification of the relationship of the proposed ordinance to general and specific plans, public hearings by the city council or board of supervisors after notice, and a further report by the planning commission in the event of modification by the legislative body. (Gov. Code, §§ 65854-65857.) Interim ordinances may be adopted as urgency measures prohibiting uses in conflict with a contemplated zoning proposal but only by four-fifths vote and only for a short period of time. (Gov. Code, § 65858.) Zoning ordinances are required to be consistent with the general plan. (Gov. Code, § 65860.) Extensive provisions regulate adoption and amendment of the general plan. (Gov.

---

[1]Beginning in 1879, the quoted language has appeared in our Constitution with nonmaterial changes. The only difference in language between the current section and former article XI, section 11, is that in lieu of the opening phrase "A county or city" the former provision stated "Any county, city, town, or township."

Code, §§ 65300-65552.) There is also provision for variances. (Gov. Code, § 65906.)

Although the zoning power is legislative, administrative duties in addition to the ones in the above code sections have been imported into the zoning process. Legislative bodies adopting zoning ordinances are not free to merely follow the interests of their constituents but must give consideration to the interests of residents of nearby communities. (*Scott v. City of Indian Wells* (1972) 6 Cal.3d 541, 546-549 [99 Cal.Rptr. 745, 492 P.2d 1137].) Recently, this court held that the California Environmental Quality Act (Pub. Resources Code, § 21050 et seq.) applied to zoning ordinances, that environmental impact reports must be prepared in cases of significant environmental impact, and that legislative bodies are required to make a written finding of no significant impact before enacting zoning ordinances if the report is not prepared. (*No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, 79 et seq. [118 Cal.Rptr. 34, 529 P.2d 66].)

## INITIATIVE

Article IV, section 25 of our Constitution provides: "Initiative and referendum powers may be exercised by the electors of each city or county under procedures that the Legislature shall provide." Proponents of an initiative in a city must give notice thereof and then circulate petitions to voters. (Elec. Code, §§ 4000-4009.) If the requisite number of signatures are obtained, the ordinance is presented to the legislative body which may adopt it without change. (Elec. Code, §§ 4011, 4012.) If within 10 days it fails to adopt, the proposed ordinance must be submitted to the voters at a special or general election. (*Id.*) If the legislative body adopts the proposed ordinance without submission to the voters or if upon submission a majority of the voters approve, the proposed ordinance goes into effect, and the ordinance may not be repealed or amended except by vote of the People unless provision is otherwise made in the original ordinance. (Elec. Code, § 4015.)

## CONFLICT

The zoning law and the initiative law conflict in a number of respects. Fundamentally, the zoning statutes contemplate that to achieve orderly and wise land use regulation any change in zoning ordinances is not to

be made until the experts in the field have had an opportunity to evaluate the effects of the change after noticed hearing and report. Further, the zoning law contemplates that in evaluating zoning changes, the legislative body must refer modifications not covered by the initial report to the planning commission. Such reports as to the instant ordinance would show, for example, which lots are zoned solely for residential use and might indicate the potential liability, if any, of the city in inverse condemnation.[2] The reports would probably indicate the anticipated effect of the ordinance on surrounding communities. Preparation of reports might also lead to clarification; for example, it is unclear whether the ordinance is limited to permits for new residences or extends to permits for additions to and modifications of existing residences. The environmental impact report might show potential increases in automobile congestion and air pollution which might result because adoption of the ordinance may require many people to commute to work in Livermore.

Because of the short time limitation in the initiative, the proposed initiative ordinance must be adopted without the notice, hearings, and reports the Legislature has required for zoning changes. The initiative law conflicts with the zoning law by permitting the voters or the city council to adopt the ordinance without compliance with the specified procedures designed to insure orderly land use planning.

There are additional conflicts and potential conflicts. There is no assurance that interests of nearby residents will be considered by the electorate, although such consideration is required. There is no procedure under the initiative law for determining compliance with the general plan as required by statute. Because the city council must either reject or accept the proposed ordinance without change, it does not have the opportunity to impose conditions and modifications in the initiative process as provided in the zoning statutes. There are potential conflicts between the initiative law's requirement that amendment be by the voters and the zoning law's provision for variances, and between the majority vote of the initiative and the zoning law's specific requirements for interim zoning.

---

[2]The issue of inverse condemnation is not raised in argument but the issue is raised by the adoption of the ordinance. (Cf. *Goldblatt* v. *Hempstead* (1972) 369 U.S. 590 [8 L.Ed.2d 130, 82 S.Ct. 987], *Penna. Coal Co.* v. *Mahon* (1922) 260 U.S. 393, 415 [67 L.Ed. 322, 43 S.Ct. 158, 28 A.L.R. 1321]; *Eldridge* v. *City of Palo Alto* (1976) 57 Cal.App.3d 613, 618 et seq. [129 Cal.Rptr. 575].)

The conflict between the two statutes is clear. The zoning laws establish an administrative process which must be followed prior to the legislative act of adopting an ordinance. The initiative statutes leave no room to carry out the administrative function. Both the statutes governing zoning of general law cities and governing initiative in such cities find their authority in our Constitution. Thus, there is no basis for the majority's thesis suggesting that the Constitution requires that initiative law take precedence over the zoning law insofar as there may be conflict. Rather, the familiar rule that the specific governs the general in cases of conflict is applicable, and as held in *Hurst,* the zoning statutes must be given effect. The reasoning of *Hurst* is as applicable today as it was when the case was decided in 1929, if not more so in view of new administrative procedures governing land use planning, and I would reaffirm *Hurst.*

It is ironic that today's decision, reviewing a "no growth" ordinance, may provide a loophole for developers to avoid the numerous procedures established by the Legislature which in recent years have made real estate development so difficult. Seeking approval of planned unit developments, land developers with the aid of the building trade unions should have little difficulty in securing the requisite signatures for an initiative ordinance. Because of today's holding that the initiative takes precedence over zoning laws, the legislative scheme of notice, hearings, agency consideration, reports, findings, and modifications can be bypassed, and the city council may immediately adopt the planned unit development or, if the council refuses, the voters may approve.[3] However desirable the creation of the loophole and the elimination of so-called administrative red tape it is not for this court, but for the Legislature to determine whether the current housing crisis warrants bypassing the zoning laws.[4]

---

[3]The validity of *Hurst* was raised for the first time in this court by amici curiae. Associated Home Builders did not respond to the amici brief—the interests of Associated Home Builders' members extending beyond the borders of Livermore, they may well have preferred repudiation of *Hurst* to invalidation of the Livermore ordinance.

[4]Although the majority hold that the Livermore ordinance does not conflict with Government Code sections 65853-65857, they do not deal with potential conflicts between the zoning ordinance before us and other zoning statutes, for example, whether the initiative conflicts with a general plan in violation of Government Code section 65860, whether the ordinance conflicts with section 65858 of that code limiting interim ordinances, and whether there is a conflict with the four-fifths approval requirement of that section. In regard to the latter, the ordinance was approved by approximately 55 percent of those voting, 36 percent of the registered voters. Presumably, the additional conflicts may be raised when the case is returned to the trial court.

I would affirm the judgment.

**MOSK, J.**—I dissent.

Limitations on growth may be justified in resort communities, beach and lake and mountain sites, and other rural and recreational areas; such restrictions are generally designed to preserve nature's environment for the benefit of all mankind. They fulfill our fiduciary obligation to posterity. As Thomas Jefferson wrote, the earth belongs to the living, but in usufruct.[1]

But there is a vast qualitative difference when a suburban community invokes an elitist concept to construct a mythical moat around its perimeter, not for the benefit of mankind but to exclude all but its fortunate current residents.

The procedural posture of the ordinance does not detain me; the majority is correct in overruling *Hurst* v. *Burlingame* (1929) 207 Cal. 134 [277 P. 308]. The *Hurst* doctrine has long outlived its usefulness; it should no longer hobble the initiative process. Where I part company with the majority is in its substantive holding that a total exclusion of new residents can be constitutionally accomplished under a city's police power.

The majority, somewhat desultorily, deny that the ordinance imposes an absolute prohibition upon population growth or residential construction. It is true that the measure prohibits the issuance of building permits for single-family residential, multiple residential and trailer residential units until designated public services meet specified standards. But to see such restriction in practicality as something short of total prohibition is to employ ostrich vision.

First of all, the ordinance provides no timetable or dates by which the public services are to be made adequate. Thus the moratorium on permits is likely to continue for decades, or at least until attrition ultimately reduces the present population. Second, it is obvious that no inducement exists for *present* residents to expend their resources to render facilities adequate for the purpose of accommodating *future*

---

[1]Jefferson called this principle "self-evident." (Laing, *Jefferson's Usufruct Principle* (July 3, 1976) 223 The Nation Magazine, p. 7.)

residents. It would seem more rational, if improved services are really contemplated for any time in the foreseeable future, to admit the new residents and compel them to make their proportionate contribution to the cost of the educational, sewage and water services. Thus it cannot seriously be argued that Livermore maintains anything other than total exclusion.

The trial court found, inter alia, that the ordinance prohibited the issuance of building permits for residential purposes until certain conditions are met, but the measure does not provide that any person or agency is required to expend or commence any efforts on behalf of the city to meet the requirements. Nor is the city itself obliged to act within any specified time to cure its own deficiencies. Thus, in these circumstances procrastination produces its own reward: continued exclusion of new residents.

The significant omissions, when noted in relation to the ordinance preamble, reveal that the underlying purpose of the measure is "to control residential building permits in the City of Livermore"—translation: to keep newcomers out of the city—and not to solve the purported inadequacies in municipal educational, sewage and water services. Livermore concedes no building permits are now being issued and it relates no current or prospective schedule designed to correct its defective municipal services.

A municipal policy of preventing acquisition and development of property by nonresidents clearly violates article I, sections 1 and 7, subdivisions (a) and (b), of the Constitution of California.

Exclusion of unwanted outsiders, while a more frequent phenomenon recently, is not entirely innovative. The State of California made an abortive effort toward exclusivity back in the 1930s as part of a scheme to stem the influx of poor migrants from the dust bowl states of the southwest. The additional burden these indigent new residents placed on California services and facilities was severely aggravated by the great depression of that period. In *Edwards* v. *California* (1941) 314 U.S. 160 [86 L.Ed. 119, 62 S.Ct. 164], the Supreme Court held, however, that the nature of the union established by the Constitution did not permit any one state to "isolate itself from the difficulties common to all of them by restraining the transportation of persons and property across its borders." The sanction against immigration of indigents was invalidated.

If California could not protect itself from the growth problems of that era, may Livermore build a Chinese Wall to insulate itself from growth problems today? And if Livermore may do so, why not every municipality in Alameda County and in all other counties in Northern California? With a patchwork of enclaves the inevitable result will be creation of an aristocracy housed in exclusive suburbs while modest wage earners will be confined to declining neighborhoods, crowded into sterile, monotonous, multifamily projects, or assigned to pockets of marginal housing on the urban fringe. The overriding objective should be to minimize rather than exacerbate social and economic disparities, to lower barriers rather than raise them, to emphasize heterogeneity rather than homogeneity, to increase choice rather than limit it.

I am aware, of course, of the decision in *Village of Belle Terre* v. *Boraas* (1974) 416 U.S. 1 [39 L.Ed.2d 797, 94 S.Ct. 1536], in which the Supreme Court, speaking through Justice Douglas, rejected challenges to an ordinance restricting land use to one-family dwellings, with a very narrow definition of "family," excluding lodging houses, boarding houses, fraternity houses, or multiple-dwelling houses. The village sought to assure that it would never grow much larger than 700 persons living in 220 residences. Comparable, although some growth was permitted, was the ordinance approved in *Construction Ind. Ass'n, Sonoma Cty.* v. *City of Petaluma* (9th Cir. 1975) 522 F.2d 897. Also similar, although allowing phased growth, was *Golden* v. *Planning Board of Town of Ramapo* (1972) 30 N.Y.2d 359 [334 N.Y.S.2d 138, 285 N.E.2d 291].[2]

In *Belle Terre,* Justice Douglas declared, "The police power is not confined to elimination of filth, stench, and unhealthy places. . . . It is ample to lay out zones where family values, youth values, and the blessings of quiet seclusion and clean air make the area a sanctuary for people . . . . A quiet place where yards are wide, people few, and motor vehicles restricted are legitimate guidelines in a land-use project addressed to family needs."

This is a comforting environmentalist declaration with which few would disagree, although the result was to allow the village of Belle

---

[2]There are other variations in traditional zoning that attempt to accommodate both orderly development and community concerns: flexible zoning, compensatory regulations, planned unit development, density zoning, contract zoning, floating zoning and time-phased zoning. Until now total prohibition of all building permits has never been included among acceptable zoning schemes.

Terre to remain an affluent island. Nevertheless, "preservation of the character of the community" is a stirring slogan, at least where it is used for nothing more harmful than the exclusion of the six students who rented the large house in Belle Terre. Complications arise when ordinances are employed to exclude not merely student lodgers, but all outsiders. While the affluent may seek a congenial suburban atmosphere other than Belle Terre or Livermore, what are the alternatives for those in megalopolitan areas who cannot afford similar selectivity?

The right of all persons to acquire housing is not a mere esoteric principle; it has commanded recognition in a wide spectrum of aspects. In *Shelley* v. *Kraemer* (1948) 334 U.S. 1 [92 L.Ed. 1161, 68 S.Ct. 836, 3 A.L.R.2d 441], race restrictive covenants were declared to be constitutionally unenforceable. Chief Justice Vinson noted in his opinion that among the guarantees of the Fourteenth Amendment "are the rights to acquire, enjoy, own and dispose of property." In *Reitman* v. *Mulkey* (1967) 387 U.S. 369 [18 L.Ed.2d 830, 87 S.Ct. 1627], the Supreme Court upheld our invalidation of a ballot proposition, declaring that " 'Neither the State nor any subdivision or agency thereof shall deny, limit or abridge, directly or indirectly, the right of any person, who is willing or desires to sell, lease or rent any part or all of his real property, to decline to sell, lease or rent such property to such person or persons as he, in his absolute discretion, chooses.' " Justice Douglas, in a concurring opinion in *Reitman,* went even further to insist that "housing is clearly marked with the public interest." (*Id.* at p. 385 [18 L.Ed.2d at p. 840].) Again in *Jones* v. *Mayer Co.* (1968) 392 U.S. 409, 418 [20 L.Ed.2d 1189, 1196, 88 S.Ct. 2186], a case involving racial discrimination in housing, Justice Stewart spoke of the right of all citizens " 'to inherit, purchase, lease, sell, hold, and convey real and personal property.' " (Also see *Buchanan* v. *Warley* (1917) 245 U.S. 60 [62 L.Ed. 149, 38 S.Ct. 16].)

One thing emerges with clarity from the foregoing and from numerous related cases: access to housing is regarded by the Supreme Court as a matter of serious social and constitutional concern. While this interest has generally been manifest in the context of racial discrimination, there is no valid reason for not invoking the principle when persons of all races and of all economic groups are involved. There are no invariable racial or economic characteristics of the goodly numbers of families which seek social mobility, the opportunities for the good life available in a suburban atmosphere, and access to types of housing, education and employment differing from those indigenous to crowded urban centers.

There is a plethora of commentary on efforts, in a variety of contexts, of local communities to discourage the influx of outsiders. In virtually every instance, however, the cities limited availability of housing; until now it has never been seriously contemplated that a commmunity would attempt total exclusion by refusing all building permits. (See, e.g., Williams & Doughty, *Studies in Legal Realism: Mount Laurel, Belle Terre and Berman* (1975) 29 Rutgers L.Rev. 73; Note, *Phased Zoning: Regulation of the Tempo and Sequence of Land Development* (1974) 26 Stan.L.Rev. 585; Note, *The Right to Travel and Exclusionary Zoning* (1974) 26 Hastings L.J. 849; Deutsch, *Land Use Growth Controls: A Case Study of San Jose and Livermore, California* (1974) 15 Santa Clara Law. 1; Schroeder, *Public Regulation of Private Land Use,* 1973 Law & Soc. Order 747; Large, *This Land is Whose Land? Changing Concepts of Land as Property* (1973) Wis.L.Rev. 1039; Gaffrey, *Containment Policies for Urban Sprawl,* Univ. of Kan. Publications, No. 27; McClaughry, *The New Feudalism* (1975) 5 Environmental L.Rev. 675; Kohl, *The Environmental Movement: What Might It Be?* (1975) 15 Nat.Res.J. 327; Note, *The Right to Travel: Another Constitutional Standard for Local Land Use Regulations?* (1972) 39 U.Chi.L.Rev. 612; Note, *The Responsibility of Local Zoning Authorities to Nonresident Indigents* (1971) 23 Stan.L.Rev. 774; Note, *Exclusionary Zoning and Equal Protection* (1971) 84 Harv.L.Rev. 1645; Sager, *Tight Little Islands: Exclusionary Zoning, Equal Protection, and the Indigent* (1969) 21 Stan.L.Rev. 767.)

The trend in the more perceptive jurisdictions is to prevent municipalities from selfishly donning blinders to obscure the problems of their neighbors. The Supreme Court of New Jersey has taken the lead in frowning upon creation of local exclusive enclaves and in insisting upon consideration of regional housing needs. In *Oakwood at Madison, Inc.* v. *Township of Madison* (1971) 117 N.J.Sup. 11 [283 A.2d 353, 358], the court held, "In pursuing the valid zoning purpose of a balanced community, a municipality must not ignore housing needs, that is, its fair proportion of the obligation to meet the housing needs of its own population *and of the region.* Housing needs are encompassed within the general welfare. *The general welfare does not stop at each municipal boundary.*" (Italics added.)

Again in the oft-cited *Mt. Laurel* case (*So. Burlington Cty. N.A.A.C.P.* v. *Tp. of Mt. Laurel* (1975) 67 N.J. 151 [336 A.2d 713, 724]) the New Jersey Supreme Court required that municipalities afford the opportunity for housing, "at least to the extent of the municipality's fair share of

the present and *prospective regional need* therefor." (Italics added.) (Also see *Schere* v. *Township of Freehold* (1972) 119 N.J.Sup. 433 [292 A.2d 35, 37].)

Pennsylvania is another state that has forthrightly spoken out against ordinances "designed to be exclusive and exclusionary." In *National Land and Investment Company* v. *Kohn* (1966) 419 Pa. 504 [215 A.2d 597, 612], a case remarkably similar to the instant matter, the Easttown community refused to admit new residents "unless such admittance will not create any additional burdens upon governmental functions and services." Justice Roberts, for the Supreme Court, replied: "The question posed is whether the township can stand in the way of the natural forces which send our growing population into hitherto undeveloped areas in search of a comfortable place to live. We have concluded not. A zoning ordinance whose primary purpose is to prevent the entrance of newcomers in order to avoid future burdens, economic and otherwise, upon the administration of public services and facilities cannot be held valid."

In *Appeal of Girsh* (1970) 437 Pa. 237 [263 A.2d 395], the Pennsylvania Supreme Court again spoke from a broad perspective. The community involved there barred all apartment houses for the identical reasons advanced by Livermore here. Said the court with irrefutable logic: "Appellee argues that apartment uses would cause a significant population increase with a resulting strain on available municipal services and roads, and would clash with the existing residential neighborhood. But we *explicitly* rejected both these claims in *National Land,* supra: 'Zoning is a tool in the hands of governmental bodies which enables them to more effectively meet the demands of evolving and growing communities. It must not and can not be used by those officials as an instrument by which they may shirk their responsibilities. Zoning is a means by which a governmental body can plan for the future—it may not be used as a means to deny the future. . . . Zoning provisions may not be used . . . to avoid the increased responsibilities and economic burdens which time and natural growth invariably bring.' 419 Pa. at 527-528, 215 A.2d at 610. . . .

". . . Appellee here has simply made a decision that it is content with things as they are, and that the expense or change in character that would result from people moving in to find 'a comfortable place to live'

are for someone else to worry about. That decision is unacceptable. Statistics indicate that people are attempting to move away from the urban core areas, relieving the grossly overcrowded conditions that exist in most of our major cities. . . . It follows then that formerly 'outlying,' somewhat rural communities, are becoming logical areas for development and population growth—in a sense suburbs to the suburbs. With improvements in regional transportation systems, these areas also are now more accessible to the central city.

"In light of this, Nether Providence Township may not permissibly choose to only take as many people as can live in single-family housing, in effect freezing the population at near present levels. Obviously if every municipality took that view, population spread would be completely frustrated. Municipal services must be provided *somewhere,* and if Nether Providence is a logical place for development to take place, it should not be heard to say that it will not bear its rightful part of the burden." (*Id.* at pp. 398-399; fn. omitted.)

In *Girsh* the Pennsylvania court added: "Perhaps in an ideal world, planning and zoning would be done on a *regional* basis, so that a given community would have apartments, while an adjoining community would not. But as long as we allow zoning to be done community by community, it is intolerable to allow one municipality (or many municipalities) to close its doors at the expense of surrounding communities and the central city." (*Id.* at p. 399, fn. 4.)

Ordinances comparable to those invalidated in New Jersey and Pennsylvania have also been held invalid in Michigan (*Bristow* v. *City of Woodhaven* (1971) 35 Mich.App. 205 [192 N.W.2d 322]), Maryland (*Baltimore Planning Com'n* v. *Victor Development Co.* (1971) 261 Md. 358 [275 A.2d 478]) and Connecticut (*Beach* v. *Planning & Zoning Commission* (1954) 141 Conn. 79 [103 A.2d 814]).

. In sum, I realize the easiest course is for this court to defer to the political judgment of the townspeople of Livermore, on a they-know-what's-best-for-them theory (*Eastlake* v. *Forest City Enterprises, Inc.* (1976) 426 U.S. 668 [49 L.Ed.2d 132, 96 S.Ct. 2358]; *James* v. *Valtierra* (1971) 402 U.S. 137 [28 L.Ed.2d 678, 91 S.Ct. 1331]). But conceptually, when a locality adopts a comprehensive, articulated program to prevent any population growth over the foreseeable future, it places its public

policy intentions visibly on the table for judicial scrutiny and constitutional analysis.

Communities adopt growth limits from a variety of motives. There may be conservationists genuinely motivated to preserve general or specific environments. There may be others whose motivation is social exclusionism, racial exclusion, racial discrimination, income segregation, fiscal protection, or just fear of any future change; each of these purposes is well served by growth prevention.

Whatever the motivation, total exclusion of people from a community is both immoral and illegal. (Cal. Const., art. I, §§ 1, 7, subds. (a) & (b).) Courts have a duty to prevent such practices, while at the same time recognizing the validity of genuine conservationist efforts.

The problem is not insoluble, nor does it necessarily provoke extreme results. Indeed, the solution can be relatively simple if municipal agencies would consider the aspirations of society as a whole, rather than merely the effect upon their narrow constituency. (See, e.g., A.L.I. Model Land Development Code, art. 7.) Accommodation between environmental preservation and satisfaction of housing needs can be reached through rational guidelines for land-use decision-making. Ours, of course, is not the legislative function. But two legal inhibitions must be the benchmark of any such guidelines. First, any absolute prohibition on housing development is presumptively invalid. And second, local regulations, based on parochialism, that limit population densities in growing suburban areas may be found invalid unless the community is absorbing a reasonable share of the region's population pressures.

Under the foregoing test, the Livermore ordinance is fatally flawed. I would affirm the judgment of the trial court.