[Civ. No. 26558. First Dist., Div. Two. Aug. 30, 1971.]

COUNTY OF ALAMEDA et al., Plaintiffs and Respondents, v. CITY AND COUNTY OF SAN FRANCISCO et al., Defendants and Appellants.

## Counsel

Thomas M. O'Connor, City Attorney, Michael C. Killelea, Deputy City Attorney, Saveri & Saveri, Richard Saveri and Peter J. Donnici for Defendants and Appellants.

Richard J. Moore, County Counsel, John B. Clausen, County Counsel, Arthur W. Walenta, Jr., Deputy County Counsel, Douglas J. Maloney, County Counsel, Keith Sorenson, District Attorney, James M. Parmalee, Chief Deputy District Attorney, William M. Siegel, County Counsel, and Byron D. Athan, Deputy County Counsel, for Plaintiffs and Respondents.

## Opinion

**SHOEMAKER, P. J.**—The instant action was brought by five bay area counties against the City and County of San Francisco and its tax collector,

Londo Cassassa. The complaint herein alleges that on August 21, 1968, defendant city and county enacted an ordinance imposing a fee in the amount of 1 percent of adjusted gross income upon all persons who were employed in the City and County of San Francisco but resided elsewhere. It was alleged that some 200,000 persons who would be subject to said tax resided in the five plaintiff counties and that this action was on their behalf to protect them against arbitrary, discriminatory and illegal taxation. Plaintiffs sought a judicial declaration that the San Francisco ordinance was illegal and void and a temporary and permanent injunction prohibiting enforcement of the ordinance.

Following the issuance of an order to show cause, defendants demurred to the complaint on the ground that plaintiff counties were not the real parties in interest and lacked standing to sue.[1] The court overruled the demurrer, and defendants answered, denying that the ordinance under attack was invalid.

The trial court held the San Francisco ordinance unconstitutional and invalid and issued a preliminary injunction prohibiting defendants from enforcing the ordinance. Defendants appeal from the judgment.

The San Francisco ordinance subject of the instant action provides for "the imposition of license fees for the privilege of engaging in occupations, trades and professions in the City and County of San Francisco by all non-resident persons employed by others. . . ." The ordinance is premised upon the board of supervisors' findings that nonresidents employed in San Francisco have not heretofore paid for services furnished by the taxpayers of San Francisco; that the cost of such services is $69,623,508 and that nonresidents should pay an equitable portion of such cost; that the total "population" of San Francisco is 944,500, of which 756,900 are residents and 187,600 are commuters; that the adjusted gross income earned by the commuter population of San Francisco is $1,267,000,000; that commuters constitute 19.9 percent of the total population of San Francisco and that they should be required to pay 19.9 percent of the cost of the services enjoyed by both residents and commuters. The ordinance provides for the imposition of a license fee equal to 1 percent of his adjusted gross receipts upon every nonresident employed in San Francisco and earning annual wages of $4,000 or more. Employers of nonresidents are required to deduct said fees from the compensation due the employees. Employees who fail to pay the license fee and employers who fail to with-

---

[1]This ground of demurrer, staunchly argued on appeal by defendants, has been waived by defendants so that this cause may be decided on the merits without any further delay (see *Cal. Gas. Retailers* v. *Regal Petroleum Corp.* (1958) 50 Cal.2d 844 [330 P.2d 778]).

hold same are guilty of a misdemeanor and may be fined $500 and imprisoned for six months.

The most striking feature of the tax ordinance is that it applies solely to nonresidents employed by others in San Francisco. Although the ordinance purports to impose a license fee for the privilege of working in San Francisco, the ordinance in fact creates two classes of San Francisco employees: residents and nonresidents. While a resident is free to engage in the occupation of his choice without the payment of any tax, a nonresident who wishes to pursue the same occupation is prohibited from doing so unless he pays the required license fee. The question before us is whether such inequality in treatment is constitutionally permissible.

It has been determined that a state may not discriminate in this manner against the residents of other states. In *Travis* v. *Yale & Towne Mfg. Co.* (1920) 252 U.S. 60 [64 L.Ed. 460, 40 S.Ct. 228], the State of New York had imposed an income tax upon all residents and nonresidents carrying on occupations within the state, but had granted substantial exemptions to all residents subject to the tax. The Supreme Court held that the tax violated the privileges and immunities clause of the federal Constitution. The court stated: "The case is typical; it being a matter of common knowledge that from necessity, due to the geographical situation of [New York City], in close proximity to the neighboring States, many thousands of men and women, residents and citizens of those States, go daily from their homes to the city and earn their livelihood there. They pursue their several occupations side by side with residents of the State of New York—in effect competing with them as to wages, salaries, and other terms of employment. Whether they must pay a tax upon the first $1,000 or $2,000 of income, while their associates and competitors who reside in New York do not, makes a substantial difference. Under the circumstances as disclosed, we are unable to find adequate ground for the discrimination, and are constrained to hold that it is an unwarranted denial to the citizens of Connecticut and New Jersey of the privileges and immunities enjoyed by citizens of New York. This is not a case of occasional or accidental inequality due to circumstances personal to the taxpayer [citations]; but a general rule, operating to the disadvantage of all non-residents including those who are citizens of the neighboring States, and favoring all residents including those who are citizens of the taxing State." (Pp. 80-81 [64 L.Ed. p. 470].)

The instant case is obviously distinguishable on its facts from the *Travis* case, since the geographical situation of San Francisco is totally unlike that of New York City, and the enforcement of the San Francisco ordinance would not, as a matter of practical necessity, result in discrimi-

nation against residents of other states. The plaintiffs in the instant action represent the residents of five California counties who would be affected by the ordinance, and the problem before us is thus one of discrimination on an intercity rather than an interstate basis. However, this distinction is in reality of little significance, since the problems arising from intercity discrimination may be equally as great, if not greater, than those arising from interstate discrimination. We are of the opinion that similar constitutional safeguards should apply in both situations.

In the recent case of *City of Los Angeles* v. *Shell Oil Co.* (1971) 4 Cal.3d 108, 119 [93 Cal.Rptr. 1, 480 P.2d 953], our Supreme Court stated: "Although the Constitution of this state, unlike that of the United States, contains no provision specifically preventing its constituent political subdivisions from enacting laws affecting commerce among them, there is no doubt that many of the considerations relevant to problems of interstate commerce apply in microcosm to the problems of intrastate or intercity commerce in a heavily populated state such as our own. In the words of one perceptive commentator: 'The basic policy underlying the commerce clause of the Federal Constitution [art. I, § 8, par. 3]—to preserve the free flow of commerce among the states to optimize economic benefits—is equally applicable to intercity commerce within the state. If fifty independent economic units within the United States are undesirable, 387 economic enclaves within California would be intolerable. A tax burden which places intercity commerce at a disadvantage in comparison to a wholly intracity business may have such an effect.' (Sato, *Municipal Occupation Taxes in California: The Authority to Levy Taxes and The Burden on Intrastate Commerce* (1965) 53 Cal.L.Rev. 801, 818, fn. omitted.)"

The court went on to point out that those provisions of the state and federal Constitutions which guaranteed equal protection of the laws proscribed local taxes which operated to unfairly discriminate against intercity business (p. 124).

The prohibition against arbitrary discrimination by a city against nonresidents is not a new concept in the California law. In the early case of *Ex parte Haskell* (1896) 112 Cal. 412 [44 P. 725], the court upheld an ordinance imposing a license tax upon merchants having no fixed place of business. The court pointed out that the ordinance was based upon a valid and reasonable distinction between different methods of conducting a business, but the court went on to state, "It may be conceded that, if [the ordinance] could be said to discriminate in favor of residents of the city . . . by requiring such license only from nonresidents engaged in the [same] line of business . . . , it would be bad; . . ." (P. 419.)

In *Bueneman* v. *City of Santa Barbara* (1937) 8 Cal.2d 405 [65 P.2d

884, 109 A.L.R. 895], the court held invalid an ordinance which imposed a license fee upon all persons who engaged in the laundry business within the city but performed the actual laundering outside the city. The court pointed out that although a city could validly classify different types of business for purposes of taxation, it had no right to tax persons doing a particular kind of business within a city and to entirely exempt other persons doing the same business in essentially the same way. The court noted that equal protection was the very basis of constitutional government and concluded, "There can be no doubt that the Santa Barbara ordinance is an attempt to discriminate in favor of laundries within the city. That legislation of such character may discriminate is not denied. There may be discrimination founded upon a reasonable classification of all persons transacting the same kind of business. But discrimination cannot go to the extent of being a mere subterfuge for legislation directed against a particular group of taxpayers." (P. 415.)

In *Continental B. Co.* v. *City of Escondido* (1937) 21 Cal.App.2d 388 [69 P.2d 181], the court upheld an ordinance which imposed a tax upon all bakers doing business within the city but provided that the tax should be greater for those bakers who did not operate from plants which were located within the city and listed on the city tax rolls. The court held that the city had a valid reason for imposing a lighter tax upon those bakers with plants in the city because they were obliged to pay ad valorem taxes to the city on the real and personal property devoted to their businesses. The court distinguished the *Bueneman* case, noting that the ordinance in Bueneman did not provide for a mere difference in the *amount* of the tax imposed, but totally exempted from all taxation those individuals who had plants within the city. After reviewing a number of prior decisions, the court concluded that a tax ordinance could lawfully accord different treatment to two classes of taxpayers if the tax "is actually imposed upon both classes" and the tax on one class "is not so disproportionately heavy as to .demonstrate that the classification is 'a mere subterfuge for legislation directed against a particular group of taxpayers.'" (P. 393.)

Subsequent California cases have continued to adhere to the limitations expressed in the *Continental* case (see *Sivertsen* v. *City of Menlo Park* (1941) 17 Cal.2d 197, 200 [109 P.2d 928]; *Hansen* v. *Town of Antioch* (1941) 18 Cal.2d 110, 113 [114 P.2d 329]; and no California case has ever upheld an ordinance which distinguishes between residents and non-residents engaged in the same business and imposes a license fee or income tax solely upon nonresidents.

Defendants contend that the imposition of a license tax solely upon non-residents employed in San Francisco is justified by the board of super-

visors' findings that commuters should be required to pay their fair share of the cost of services which San Francisco provides to residents and nonresidents. We do not agree.

■ First of all, we note from the board's findings that the San Francisco ordinance does far more than require commuters to pay their fair share of the cost of the services furnished by San Francisco. The ordinance integrates into a mathematical formula the total income earned by nonresidents in San Francisco, the cost to San Francisco of public services and the percentage of commuters to residents. Since nonresidents constitute 19.9 percent of the total "population" of San Francisco, the ordinance applies to the adjusted gross income of nonresidents a tax rate which will cause the total nonresident population to bear 19.9 percent of the cost of the services furnished by San Francisco.

We are satisfied the formula adopted is arbitrary, since if the purpose of the ordinance is in fact to require commuters to pay for the services they enjoy, the only sound basis for apportionment would be occupancy in San Francisco. The time spent by commuters in San Francisco, rather than the percentage of commuters to the total population, has a direct bearing upon the services which commuters use. The San Francisco ordinance totally ignores the fact that individuals who work in San Francisco and reside elsewhere are normally absent from San Francisco during any given week for a greater number of hours than they are present in San Francisco and able to avail themselves of the services it provides.[2] The San Francisco ordinance, which is based solely upon the percentage of commuters to the total San Francisco population, cannot be deemed a valid or reasonable method of apportioning the cost of services.

■ In any event, the California cases discussed above make it clear that even though a city has justification for allocating certain costs to nonresidents, the city may not accomplish this end by imposing a tax solely upon nonresidents engaged in a particular activity, while totally exempting residents engaged in the same activity. This was the precise holding of *Bueneman* v. *City of Santa Barbara, supra,* which was recently cited with approval in *City of Los Angeles* v. *Shell Oil Co., supra,* at pages 120-121.

■ Although the court did hold in *Continental B. Co.* v. *City of Escondido, supra,* that a city could impose a slightly *heavier* tax upon nonresidents than upon residents who paid ad valorem taxes to the city, the court

---

[2]It may be noted that in the recent case of *Associated Home Builders* v. *City of Newark* (1971) 18 Cal.App.3d 107, 110 [95 Cal.Rptr. 648], the court upheld the city's determination that residential construction should be taxed at a substantially higher rate than commercial and industrial structures because the full-time requirements of residents, as opposed to the part-day requirements of those who merely work in the city, result in greater use of the streets and of fire and police protection.

expressly stated that a tax distinction between residents and nonresidents was valid only if both classes were subject to the tax and nonresidents were not subjected to a disproportionately heavier tax. The San Francisco ordinance clearly does not meet this test and therefore denies to nonresidents the equal protection of the laws.

Aside from its constitutional infirmities, the San Francisco ordinance is by its very nature likely to create a situation where retaliatory measures are enacted by neighboring cities and the state is divided into numerous warring economic units, all to the disadvantage of the individual citizen. Our Supreme Court has clearly indicated its opposition to the creation of "387 economic enclaves within California." (*City of Los Angeles* v. *Shell Oil Co., supra,* at p. 119.) The state Legislature has likewise enacted a statute designed to prohibit cities from enacting taxing ordinances such as San Francisco's. In July 1968, the Legislature enacted Government Code, section 50026, which prohibits local agencies from imposing any tax on the privilege of earning a livelihood by a nonresident employee unless the same tax, at the same rate, is imposed upon the earnings of all resident employees of the taxing jurisdiction. Section 3 of the act adding section 50026 to the Government Code provides in pertinent part, "The Legislature finds and declares that the right of citizens of California to move freely about the state in search of employment is a matter of statewide interest and concern. Any unnecessary barriers which impede the mobility of citizens of this state or limit their choice of employment are contrary to state policy. An occupation tax on employees measured by income which was not borne equally by residents and nonresidents of a taxing jurisdiction would be such a barrier." (Stats. 1968, ch. 559, § 3, p. 1226.)[3]

Judgment affirmed.

Taylor, J., and Kane, J., concurred.

---

[3]Although Government Code, section 50026, is obviously intended to prohibit the precise type of ordinance enacted by San Francisco, it is at least questionable that the Legislature possesses the power to prohibit a city from exercising its inherent power of municipal taxation. (See *Ex parte Braun* (1903) 141 Cal. 204 [74 P. 780]; *The Validity of San Francisco's Commuter Tax* (1969) 20 Hastings L.J. 813, at pp. 816, 820-821.) We cite the section solely as an indication of legislative intent.