[Civ. No. 22835. Fourth Dist., Div. One. July 1, 1982.]

CITY OF DEL MAR, Plaintiff and Appellant, v.
CITY OF SAN DIEGO et al., Defendants and Respondents,
BALDWIN BUILDERS et al., Interveners and Respondents.

COUNSEL

D. Dwight Worden, City Attorney, Shute, Mihaly & Weinberger, Mark I. Weinberger and Marc B. Mihaly for Plaintiff and Appellant.

Sideman, Meyer, Franco & Modrak and Elizabeth Meyer as Amici Curiae on behalf of Plaintiff and Appellant.

John W. Witt, City Attorney, Ronald L. Johnson, Chief Deputy City Attorney, and C. Alan Sumption, Deputy City Attorney, for Defendants and Respondents.

Luce, Forward, Hamilton & Scripps, Gregory T. Smith, Goebel & Monaghan and Louis E. Goebel for Interveners and Respondents.

OPINION

**WIENER, J.**—This appeal by the City of Del Mar (Del Mar) describes the negative, almost frightening, physical, social and financial costs imposed upon society by the further urbanization of the City of San Diego

(San Diego) in its creation of the new community called North City West. Del Mar's emotionally compelling narrative challenges San Diego's willingness to extend its megalopolis northward changing the sparse development of approximately 4,286 acres of agricultural land located 20 miles from downtown San Diego to a bustling urban enclave consisting at completion of about 40,000 people from the upper and middle classes living in expensive homes. Although the historical development of this setting is not articulated with as much fervor, the record reveals the dynamic political process extending for more than a decade which has culminated in this litigation. Public hearings relating to the policy of growth management of San Diego, including the meaning, significance and implementation of maintaining what is blithely described as the "quality of life," has consumed innumerable hours involving various interested segments of society over the last several years. The voluminous and complex reports from the various consultants and planning departments on diverse subjects all related to urban planning have been reviewed, reexamined, argued and voted upon. Now, as was probably inevitable from the start, the almost irresolvable question of whether San Diego acted correctly in giving its threshold approval for the first phase of implementation of North City West rests with the courts. Understandably, the judicial function differs considerably from that of other branches of government. The trial court approved San Diego's actions. Our analysis, provided the trial court applied the correct legal standards, is necessarily limited to whether substantial evidence supports that judgment. As we shall explain, although it is undisputed the project will have numerous adverse environmental impacts on the region, we nevertheless conclude that San Diego did not abuse its discretion in approving the steps at issue here as a rational accommodation of the social, economic and environmental interests with which the city must concern itself. We will, therefore, affirm the trial court's decision denying a writ of mandate and declaratory relief.

*Factual and Procedural Background*

Planning for North City West began over 12 years ago.[1] Nine development phases are planned, with completion of the entire project

---

[1]Although the body of our opinion describes the political process in general terms only, both the trial court and this court are well aware of the specific steps taken by San Diego before the actions challenged in this proceeding. The North City West area was first designated for growth in the Progress Guide and General Plan adopted by San Diego in 1967. Planning began with the submission of "Carmel Valley Community Plan" (exh. A-37) by the area landowners in February of 1970. On October 7, 1970, the City Council of the City of San Diego started the planning for the area. In Decem-

estimated near the year 2000. Although primarily residential, North City West, located near the northern boundary of the City of San Diego, is designed to incorporate many self-contained community concepts; one of the nine development phases is scheduled to be an employment center and commercial service centers will be located at various points in the project. Plans call for developers and landowners to finance the capital costs associated with providing needed governmental services for the community.

Carmel Valley is the first of the nine phases scheduled for development. Situated on 358 acres, it will contain 2,065 units of various types including single family, duplex, cluster and garden apartments. Population for the phase is projected at approximately 5,000 persons.

In 1979, the San Diego City Council approved the North City West Planned District Ordinance, the Carmel Valley Precise Plan, and the Carmel Valley Precise Plan Design Element which provide the necessary zoning, regulations and procedures for the submission of subdivision maps and development plans of the Carmel Valley phase. These approvals do not authorize construction; construction can begin only after the submission and approval of the subdivision maps and development plans.

Within weeks of San Diego's action, Del Mar sought a writ of mandate and declaratory relief challenging San Diego's approval of the North City West Planned District Ordinance, the Carmel Valley Pre-

---

ber of 1970, the planning department issued a study entitled "North City Study—Area Adjacent to I-5" (exh. A-1, pp. 387-421). On June 8, 1971, a "Statement of Planning Principles" (exh. A-1, pp. 383-386) governing the North City planning program was adopted by the San Diego City Council. In August of 1972, a study by the planning department of the City of San Diego entitled "New Communities, Background Study Considerations for New Communities" (exh. A-35) was presented to the city council. On November 14, 1973, the North City West community plan prepared by residents and landowners of the area was approved by the planning commission of the City of San Diego. This plan was accompanied by an environmental impact report (EQD No. 73-06-003C). On January 17, 1974, the city council held a public hearing regarding the North City West community plan and directed that the planning commission hold further public hearings (exh. A-1, p. 359). In February and May of 1974, the city council held public hearings regarding the provisions of public facilities and returned the community plan to the planning commission. After further work in 1974, the North City West community plan was finally presented to the city council and approved by that body on February 27, 1975 (exh. A-34). The conclusion to that report accurately understates, "Plan commitment more than likely, will generate controversy, not only between the City, developers and environmental groups, but among other governmental levels such as the Comprehensive Planning Organization, County, State, and Federal agencies." (*Id.*, at p. 145.)

cise Plan, and the Carmel Valley Precise Plan Design Element on three grounds. It claimed (1) San Diego failed to comply with the mandates of the California Environmental Quality Act (CEQA); (2) San Diego's approval of the project failed to adequately consider the welfare of the entire San Diego region as required by *Associated Home Builders etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038]; and (3) the approvals were inconsistent with the San Diego General Plan objective to provide adequate housing opportunities for persons of low and moderate incomes.

By stipulation, the trial proceeded in two phases. In the first, Del Mar's CEQA challenges were tried on the administrative record. The trial court found in favor of San Diego and denied the writ of mandate.

The appeal on that action was postponed pending the outcome of the declaratory relief phase, in which Del Mar's additional contentions were tried. In this second phase, evidence and testimony were presented concerning the various impacts of the North City West development on the entire San Diego region. Documentary evidence was also introduced concerning Del Mar's claim that the approvals were inconsistent with San Diego's general plan. The trial court ruled in favor of San Diego on both of Del Mar's challenges. It found the approvals did not constitute an unreasonable accommodation of various aspects of the regional welfare impacted by the project. Additionally, it concluded San Diego as a charter city was exempt from the statutory requirement that the approvals be consistent with the general plan.

*Discussion*

Earlier we touched upon the enormity of the problem in resolving the relevant considerations of urban planning to the satisfaction of all concerned. To some extent the difficulty is reflected in the CEQA which states: "[I]t is the policy of the state to ... [e]nsure that the long-term protection of the environment, consistent with the provision of a decent home and suitable living environment for every Californian, shall be the guiding criterion in public decisions." (Pub. Resources Code, § 21001.) What is so easily stated as a goal is in reality a difficult and trying process of accommodating environmental interests and housing needs in an ever-burgeoning population.

Here, several critical issues and considerations cut across the specific legal causes of action brought by Del Mar. This is understandable because the approval of North City West has as its foundation the municipal determination of how the numerous competing and necessarily conflicting interests should be resolved. Legal challenges to such an approval, regardless of the label, generally take issue with the nature of the balance struck between those interests. Accordingly, although much of what we say may appear to be repetitious, the discussion which follows will first analyze Del Mar's *Livermore* challenge, and within it the general plan consistency claim, and then proceed to discuss the CEQA argument. As will be noted, however, much of what is said in one section is equally applicable to the other.

*The Livermore Challenge*:

*North City West and the Regional Welfare*

■ Del Mar challenges the North City West approvals[2] as an improper exercise of San Diego's police power. Recognizing that any zoning decision involves a cost-benefit accommodation of competing interests, Del Mar's attack is two-pronged. On the cost side, Del Mar points to the substantial adverse environmental impacts on the San Diego region which will result from the North City West development. Del Mar argues that San Diego improperly ignored numerous opportunities to mitigate the effect of the development on air pollution levels, water supplies, sewage treatment capabilities and energy consumption. On the benefits side, Del Mar contends that North City West is an ineffective contribution to solution of the regional housing need because attempts to provide low and moderate income housing opportunities within the development are inadequate. Thus, by focusing upon the regional cost and questioning the regional benefit, Del Mar argues that the North City West approvals are unreasonable.

A.

Land use restriction is a traditional exercise of the state's police power to provide for the public health, safety and general welfare. (*Village*

---

[2]San Diego emphasizes that it is only the zoning and related approvals for the Carmel Valley phase which are being challenged in this action. While San Diego's characterization is technically correct, something more is implicitly involved. The environmental impact report for Carmel Valley notes that the project "is a commitment to allow development in North City West as a whole." (Exh. A-3, p. 138; see also Cal. Admin. Code, tit. 14, § 15069.) We therefore view the first phase of a larger sequential development as an appropriate opportunity to review the reasonableness of a municipality's commitment to the overall project to the extent that the relevant factors are currently subject to evaluation.

*of Euclid* v. *Ambler Realty Co.* (1926) 272 U.S. 365, 388 [71 L.Ed. 303, 310-311, 47 S.Ct. 114, 54 A.L.R. 1016]; *Miller* v. *Board of Public Works* (1925) 195 Cal. 477, 488 [234 P. 381, 38 A.L.R. 1479].) Normally implemented by local government acting as an arm of the state, zoning ordinances have generally been viewed as a matter of local concern.

Zoning is, very basically, the power to accommodate competing and conflicting land use interests within a locality. Historically, as the concentration of persons within localities increased, government began to recognize that the manner in which one individual used his land might have substantial effects beyond the property lines. Land use regulation was and is an attempt to mitigate these "spillover" effects for the overall benefit of the community. Local government bodies, elected to represent the various segments of that community, are appropriately constituted to accurately assess the community's general welfare which serves as the basis for the zoning accommodation.

Just as persons have congregated in increasing numbers within municipalities, so too have municipalities become clustered within expansive urban regions. San Diego County, for instance, encompasses 16 municipalities. And in some parts of the state, these regions cut across the boundaries of several counties. But just as land use decisions by individual property owners often have effects on their neighbors, so too do the effects of land use decisions by individual municipalities "spill over" into the entire urban region.

In *Associated Home Builders, etc., Inc.* v. *City of Livermore, supra*, 18 Cal.3d 582, the California Supreme Court reviewed the validity of a municipal land use ordinance which had significant spillover effects on the entire San Francisco Bay region. Pursuant to an initiative, the citizens of Livermore enacted an ordinance which imposed a moratorium on the issuance of residential building permits until local educational, sewage treatment and water supply facilities met specified standards. Since the initiative precluded new residential construction within the city, it had the effect of shifting the burden of providing new housing to other communities in the San Francisco Bay area—a substantial spillover. (*Id.*, at p. 607.) In determining whether the initiative was a legitimate exercise of Livermore's police power, the court noted, "[M]unicipalities are not isolated islands remote from the needs and problems of the area in which they are located; thus an ordinance, superficially reasonable from the limited viewpoint of the municipality,

may be disclosed as unreasonable when viewed from a larger perspective." (*Ibid.*) Although rejecting an argument that spillover ordinances should be subject to strict scrutiny—invalid unless necessary to achieve a compelling state interest (*id.*, at pp. 603-604)[3] —the court nonetheless required municipalities to evaluate more than their local self-interest in enacting such land use regulations: "We therefore reaffirm the established constitutional principle that a local land use ordinance falls within the authority of the police power if it is reasonably related to the public welfare. Most previous decisions applying this test, however, have involved ordinances without substantial effect beyond the municipal boundaries. The present ordinance, in contrast, significantly affects the interests of nonresidents who are not represented in the city legislative body and cannot vote on a city initiative. . . .

". . . . . . . . . . . . . . .

"These considerations impel us to the conclusion that the proper constitutional test is one which inquires whether the ordinance reasonably relates to the welfare of those whom it significantly affects. If its impact is limited to the city boundaries, the inquiry may be limited accordingly; if, as alleged here, the ordinance may strongly influence the supply and distribution of housing for an entire metropolitan region, judicial inquiry must consider the welfare of that region."[4] (*Id.*, at p. 607, fn. omitted.)

[3]The asserted basis for a strict scrutiny test in *Livermore* was the ordinance's interference with the constitutionally protected right to travel. (18 Cal.3d at p. 602.) The court concluded that the travel burden was only indirect and did not necessitate the stricter standard of review. In the instant case, a burden on the right to travel is understandably not alleged since the North City West approvals increase rather than restrict housing opportunities. (See also *post*, p. 414.)

[4]Although *Livermore*'s statement of the proper considerations is undoubtedly correct, inherent in the statement is something of a theoretical inconsistency. The concept of judicial deference to legislative determinations is based, at least in part, on the assumption that legislative abuse is constrained by the political process. One can normally assume that a city council will accurately assess the best interests of the city's residents; if it does not, the residents may express their dissatisfaction in the next election. But when a city council is asked to consider and evaluate the interests of non-residents (i.e., inhabitants of the region surrounding the municipality), there would appear to be a latent predisposition toward undervaluation of these interests even in the most well-meaning of municipal governing bodies. (See Willemsen & Phillips, *Down Zoning and Exclusionary Zoning in California Law* (1979) 31 Hastings L.J. 103, 136.)

Del Mar suggests what may be a solution to this dilemma when it argues that once a plaintiff has presented evidence sufficient to demonstrate the existence of significant regional spillover, the burden should shift to the enacting city to demonstrate the regional reasonableness of the land use regulation. Of course, the city need only prove it was "'fairly debatable' (*Euclid* v. *Ambler Co., supra*, 272 U.S. 365, 388 [71 L.Ed. 303,

Although *Livermore* and the instant case are similar in that both involve significant regional spillovers, it is also important to recognize some relevant distinctions. The Livermore ordinance was exclusionary in character. In Justice Mosk's words, Livermore sought to "build a Chinese Wall to insulate itself from growth problems . . . ." (18 Cal.3d at p. 618 (dis. opn. of Mosk, J.).) By refusing to permit new housing construction, Livermore was able to shift the entire burden of the regional need for new housing to other localities in the region.

By contrast, the North City West approvals are inclusionary in nature. San Diego has attempted to provide for its share of regional new housing need. Although Del Mar argues that substantial adverse environmental impacts will beset the region as a result of the construction of North City West, San Diego is in no way shielded from these impacts. There are clearly regional spillovers which San Diego must take into account, but unlike Livermore, San Diego is not able to shift the entire burden of its zoning decision to other municipalities in the region. In that sense, the San Diego action is considerably less suspect.

### B.

The trial court found and San Diego does not dispute that the construction of North City West will cause at least some significant adverse regional impacts. *Livermore* thus provides the applicable legal standard against which the reasonableness of San Diego's actions must be measured.[5] The trial court correctly applied this standard in developing findings of fact and conclusions of law. Included among them were finding of fact No. 26 and conclusion of law No. 1:

---

311]) that the ordinance reasonably relates to the regional welfare, . . ." (*Livermore, supra*, 18 Cal.3d at p. 609.) We need not decide the issue here, however, since we conclude that even if San Diego were to bear the burden of proof, it has carried that burden in this case.

[5]Both parties have referred us to the *Livermore* decision's three-step process for assessing the regional reasonableness of a challenged zoning ordinance. (See 18 Cal.3d at pp. 608-609.) While *Livermore* clearly provides the basic framework for our analysis, we do not think mechanical application of a magical three-step test is dictated. The first two steps discussed in Justice Tobriner's opinion—forecasting the "probable effect and duration of the restriction" and identifying "competing interests affected by the restriction" (*id.*, at p. 608)—are clearly directed at the restrictive exclusionary-type ordinance at issue in *Livermore*. As we have noted, the ordinance at issue in this case is not exclusionary. The third step, which we view as the heart of the *Livermore* decision, involves determining whether the ordinance represents "a reasonable accommodation of the competing interests" in light of its probable impact. (*Id.*, at p. 609.) It should be obvious that our analysis of the North City West approvals in light of this critical "third step" accommodation standard necessarily involves consideration of "probable impacts" and evaluation of "competing interests." Nevertheless, we have not thought it necessary to signpost our analysis in terms of three unvarying steps.

"26. The approvals by the City of San Diego of the Carmel Valley Precise Plan, the Carmel Valley Design Element and the Planned District Ordinance whether viewed alone, or in conjunction with City of San Diego land-use policies, promote the general welfare of the region significantly affected thereby in that:

"a. They provide needed housing in the region and in the north San Diego area and serve to satisfy housing demand in those areas;

"b. They aid in the reasonable distribution of new development along major transportation corridors and from a geographical standpoint within San Diego and the region;

"c. They provide for residences near employment centers;

"d. They will provide employment opportunities in the region and generally benefit the economy of the region;

"e. The north city and north county areas will probably experience substantial population growth without the approvals and may undergo incremental growth of negative patterns without an overall plan; and

"f. They provide relief from growth pressures for development in the north city and county areas.

".    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"1. The approvals by the City of San Diego on October 22, 1979 and November 5, 1979, relating to Carmel Valley and to North City West represent a reasonable accommodation of the competing interests of the region affected thereby."

In addition, the trial court addressed each of Del Mar's arguments dealing with specific regional impacts (e.g., air quality, water supply, sewage treatment, etc.), the sum total of which Del Mar asserted made the North City West approvals unreasonable. The trial court found otherwise. Accordingly, since the correct standard was applied, we must determine whether the trial court's findings are supported by substantial evidence.

Foundationally, it should be recognized that the parties make profoundly contradictory assumptions which affect the presentation of the

issue in all its aspects. Del Mar proceeds on the premise that North City West will *cause* all the various regional impacts which it documents, or that in other words, *but for* North City West, the articulated impacts would not occur. San Diego, on the other hand, views itself as merely planning for the inevitable population growth of the north city region. Under San Diego's approach, North City West will *cause* few if any of the impacts cited by Del Mar. In fact, the planned foundation of the North City West community will in many cases mitigate the adverse impacts which would otherwise be caused by unplanned piecemeal development.

The accuracy of these projections must, of course, await the passage of time and the impact of social, political and economic forces. Within our purview, however, the evidence includes the County of San Diego's estimate that north county population in the year 2000 will be 26,000 persons less if North City West is built. This constitutes more than substantial evidence to support the trial court's finding that "[i]f the North City West community planning area were not built as planned, residents would still come to live in the areas of the north county and north City . . . ." (Finding of fact No. 17.) Moreover, the addition of 26,000 additional persons to north county would create many if not most of the same adverse regional impacts which North City West's 40,000 residents will. By accepting growth within the city rather than shifting it to smaller municipalities and the unincorporated areas of the county, San Diego can hardly be accused of pursuing its own self-interest at the expense of the regional welfare. (Compare *Livermore, supra*, 18 Cal.3d 582.)

The trial court's findings as to each of the specific regional impacts noted by Del Mar are also supported by substantial evidence. The air quality effects were viewed by the court as significant,[6] but the fact that

[6]The trial court's finding of fact No. 23 reads as follows: "The San Diego air basin is designated a non-attainment area for all pollutants except sulfur. Any population growth will contribute to difficulties in attaining regional ambient air quality standards required by state and federal law. The air quality impact of a complete buildout of the North City West Community Plan will not be disproportionate or unreasonable compared to the air quality impact caused by other growth in the San Diego region. The accepted air quality plan assumes population increases for 1980 through 1995, and projects an average of one North City West (40,000 persons) every year during that period of time. The City of San Diego has imposed mitigation measures through the California Environmental Quality Act process which will serve to reduce air quality impacts associated with the population growth which would occur with the development of the North City West community planning area. The land management techniques include bicycle paths, carpooling incentives, transportation design structures, and the self-contained community. These measures constitute reasonable mitigation of associated air quality impacts. The impacts are regionally reasonable."

substantial growth will occur whether or not North City West is built considerably reduces the actual net impact of the development. Moreover, the self-contained community concepts utilized in the North City West design tend to mitigate the adverse air quality effects by reducing the need for automobiles and lessening trip distances.

Sewage treatment capacity and water supply were seen by the trial court as adequate when projected additions and improvements to relevant facilities were taken into account. In addition, to the extent that particularized problems in these areas arise, project modifications up to and including a moratorium on additional construction could be imposed prior to the subdivision map approvals. Similarly, the energy conservation concerns noted by Del Mar are reasonably dealt with at the subdivision map stage where approvals can require the latest in energy conservation techniques. Should San Diego fail to act reasonably in approving the subdivision maps, those actions may be challenged at the appropriate time.

Del Mar also complains of adverse fiscal impacts it and other surrounding communities will suffer. As the trial court noted, however, Del Mar will also reap fiscal benefits as a result of purchases made by North City West residents from Del Mar merchants. Given the almost 20-year duration of the project, the actual net impact is difficult to accurately predict. Noting that the experts disagreed depending on the assumptions made, the trial court reasonably concluded that "[t]he impacts will not be great and probably will not exceed the fiscal impacts to Del Mar caused by regional growth in the surrounding areas which will occur even without the buildout of the North City West community planning area." (Finding of fact No. 24.)

## C.

Of course the reasonableness of a city's land use decision involves a comparison of the perceived benefits and demonstrated costs to determine whether the project will have a net beneficial impact on the region. (*Livermore, supra,* 18 Cal.3d at p. 609.) In addition to arguing the various environmental, social and fiscal impacts previously discussed, Del Mar also contends that San Diego has overemphasized the value of the project in terms of regional housing needs. Specifically, Del Mar paints the picture of North City West as an upper-middle income community where the least expensive housing will sell for $90,000, well

above the affordable level for even moderate income individuals.[7] Del Mar also points to the low and moderate income housing goals contained in San Diego's General Plan and the North City Community Plan, and argues that San Diego's zoning decisions (i.e., the Planned District Ordinance and the Precise Plan) must be consistent with the general planning documents. (See Gov. Code, § 65860.)

While Del Mar's allegations are troubling, we think it premature to evaluate San Diego's efforts in this area for a number of reasons. First of all, Del Mar's picture is based on the assumption that no public or private housing assistance will be provided. San Diego asserts it is currently pursuing several assistance strategies, the future success of which cannot now be gauged. Second, San Diego points to requirements contained in the North City West Community Plan which provide that approximately 44 percent of the community's housing is to be made available to persons of low and moderate income as evidence of San Diego's commitment to an economically balanced community.[8] Since state law requires that subdivision map approvals be consistent with the community general plan (see Gov. Code, §§ 66473.5 and 66474, subd. (b)), San Diego's failure to provide meaningful low and moderate income housing opportunities within North City West may be challenged at the subdivision map stage. Finally, San Diego points out that one of the housing assistance strategies suggested by Del Mar—density zoning bonuses (see Gov. Code, § 65915 et seq.)—has been implemented by the San Diego City Council since the time of trial. (See San Diego Mun. Code, § 101.0307.)

While the trial court was correct in concluding that charter cities such as San Diego are statutorily exempt from the technical zoning consistency requirement contained in Government Code section 65860, Del Mar persuasively argues that a city's general plan may be viewed in many ways as the city's articulated perceptions of what constitutes the locale's "general welfare." ▮ Thus, to the extent that a city approves a zoning ordinance which is inconsistent with the city's general plan, the inconsistency must at least give rise to a presumption that the

---

[7]The "affordability level" is of course determined not only by the price of the housing but also by the prevailing interest rates, over which San Diego has no control. It should be noted that despite the relatively high price tag, there was considerable testimony that housing in North City West will be significantly less expensive than in surrounding communities.

[8]A 1980 report prepared by the San Diego Association of Governments (SANDAG) notes that San Diego is one of two municipalities within the county which provide more than their proportionate share of assisted housing. (Exhibit C-6, p. 2.)

zoning ordinance does not reasonably relate to the community's general welfare, and therefore constitutes an abuse of the city's police power.

Here, however, we do not view San Diego's decision not to adopt all the low income housing strategies suggested by Del Mar as making the North City West approvals inconsistent with the General Plan. San Diego, through the political process, may choose to meet its low income housing goals in a variety of ways; the success of its chosen strategies may well be reflected at the polls as well as judicially evaluated at a later date. Similarly, we reject Del Mar's suggestion that San Diego's choices in this regard mean that the Planned District Ordinance and Precise Plan may be classified as exclusionary wealth-based discrimination, thus necessitating a strict scrutiny standard of review. (Compare *So. Burlington Cty. N. A. A. C. P. v. Tp. of Mt. Laurel* (1975) 67 N.J. 151 [336 A.2d 713].)

## D.

In conclusion, applying the standard enunciated in *Associated Home Builders etc., Inc. v. City of Livermore, supra*, 18 Cal.3d 582, we conclude that San Diego's approval of the North City West Planned District Ordinance and the Carmel Valley Precise Plan and Design Element bears a real and substantial relationship to the general welfare of the entire San Diego region. (See 18 Cal.3d at p. 609.) Specifically, San Diego has adequately researched and considered the numerous competing interests in the region, and in view of the demonstrated need for new housing, the North City West approvals at this stage constitute a reasonable accommodation of these interests. There may be problems in the future, especially relating to the need for an economically balanced community. But San Diego has acknowledged these potential problems and indicated a commitment to finding viable solutions. We will not presume that San Diego will act unreasonably in the future, and we therefore affirm the judgment of the trial court.

*The CEQA Challenge*:

*The Obligation to Adopt Feasible Mitigation Measures*

Because Del Mar in its CEQA challenge raises almost the identical issues in its *Livermore* argument, we minimize our discussion in an effort to avoid undue repetition.

■ Del Mar does not contest the adequacy of the environment impact report (EIR) nor does it attack the findings certifying the EIR.[9] Rather it contends the North City West approvals are defective because San Diego failed to implement feasible mitigation measures and alternatives which would have reduced the adverse environmental impacts of the project. (See Pub. Resources Code, §§ 21002 and 21002.1; *Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 263, fn. 8 [104 Cal.Rptr. 761, 502 P.2d 1049].) Specifically, Del Mar focuses on various "project alternatives" which it argues would result in less environmental damage.[10] Del Mar asserts that San Diego rejected these alternatives as "infeasible" because they conflicted with the city's growth management program, without ever questioning the basis for that program. Del Mar contends that the growth management program's position as a "given" in San Diego's calculus artificially restricted the consideration of environmentally superior project alternatives.

There is, however, a fatal flaw central to Del Mar's reasoning which has been noted before: Del Mar assumes that if San Diego chooses not to grow, the growth rate in the San Diego region will be correspondingly reduced. While it is true that a smaller or nonexistent North City West would restrict the regional housing supply and increase housing prices, thereby economically deterring some persons from migrating to the region, many factors other than housing supply suggest that San Diego County will continue to grow. (See *ante*, p. 414.) Del Mar appears to be arguing that San Diego must adopt a *Livermore*-type growth re-

---

[9]This certification procedure involves a balancing of the adverse environmental impacts against the social and economic benefits of the project. (*San Francisco Ecology Center* v. *City and County of San Francisco* (1975) 48 Cal.App.3d 584, 589 [122 Cal.Rptr. 100].) A court must determine whether substantial evidence supports the government agency's decision to approve the project. (*Id.*, at p. 596.) Although Del Mar's CEQA challenge did not raise the issue, Del Mar notes that the argument is implicitly part of the *Livermore* challenge discussed previously. See *ante*, pp. 407-408.)

[10]The alternatives suggested by Del Mar include:

1. The "no project" alternative, whereby the North City West area would be retained as a rural community under existing agricultural zoning and urban development redirected to other locations in the region to encourage the creation of a more compact urban form.

2. The "delayed or phased project" alternative, whereby the North City West project would be initiated at a later time or phased over a longer period of time.

3. The "reduced project scope" alternative, whereby the area that would be developed as North City West would be reduced.

4. The "reduced density" alternative, whereby the North City West area would develop at a lower overall density such as that which would result from estate type development.

strictive solution without acknowledging the numerous significant adverse impacts which that approach entails.

In point of fact, San Diego considered and reasonably rejected the project alternatives suggested by Del Mar as infeasible in view of the social and economic realities in the region. We recognize that many affected persons and entities including Del Mar would prefer that North City West not be built. Yet they are no more entitled than San Diego to "insulate" themselves from regional problems. (*Livermore, supra,* 18 Cal.3d at p. 618 (dis. opn. of Mosk, J.).) A delayed or reduced North City West development might well bring complaints from other municipalities in the region that San Diego was abdicating its responsibility to provide for its fair share of the regional need for new housing.

In arguing that San Diego has misconstrued the scope of CEQA's infeasibility requirement (Pub. Resources Code, § 21081, subd. (c); see also § 21061.1),[11] Del Mar asserts, "By posing the issue as a conflict between this growth policy and the project alternatives, San Diego asked and resolved the question of whether it was 'desirable' not whether it was 'feasible' to further reduce or avoid the environmental impacts of the North City West project." But Del Mar recognizes, as it must, that feasibility involves a balancing of various "economic, environmental, social, and technological factors." (Pub. Resources Code, § 21061.1.) As stated earlier, San Diego has attempted to accommodate these factors in devising a staged growth management plan for the city which includes the North City West development. Assuming this accommodation is a reasonable one (see *ante,* p. 412), San Diego is entitled to rely on it in evaluating various project alternatives. The cost-benefit analysis which led to the accommodation is of course subject to review, but it need not be mechanically restated at every stage of an approval process. In this sense, "feasibility" under CEQA encompasses "desirability" to the extent that desirability is based on a reasonable balancing of the relevant economic, environmental, social, and technological factors. We accordingly conclude that San Diego did not abuse its discretion under CEQA in rejecting various project alternatives as infeasible.

---

[11]Public Resources Code section 21081, subdivision (c) requires that before a public agency approves a project with significant unavoidable environmental impacts, it must make a finding that "[s]pecific economic, social, or other considerations make infeasible the mitigation measures or project alternatives identified in the environmental impact report."

*Disposition*

The trial court's order denying a writ of mandate is affirmed, as is the judgment in favor of San Diego on the remaining causes of action.

Cologne, Acting P. J., and Work, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 21, 1982.