[No. A065542. First Dist., Div. Five. Apr. 12, 1995.]

CITY OF CUPERTINO et al., Plaintiffs and Appellants, v.
CITY OF SAN JOSE et al., Defendants and Respondents.

**COUNSEL**

Shute, Mihaly & Weinberger, E. Clement Shute, Jr., and Tamara S. Galanter for Plaintiffs and Appellants.

Joan R. Gallo, City Attorney, George Rios, Assistant City Attorney, Joseph DiCiuccio and Glenn D. Schwarzbach, Deputy City Attorneys, for Defendants and Respondents.

**OPINION**

**PETERSON, P. J.**—In this case, we will hold that the regional welfare doctrine adopted by our Supreme Court in *Associated Home Builders etc.*

*Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038] (*Livermore*), as a limit on a city's power to make land-use decisions, does not apply to and cannot be used to challenge a city ordinance that modifies a business tax on those who operate landfills within the city's jurisdiction.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The facts of this case are largely undisputed and can be summarized as follows.

The City of San Jose currently has four privately owned landfills operating within its jurisdiction. Each of the landfills accepts waste and refuse from the residents of San Jose and from the residents of the surrounding communities. San Jose alone bears the cost of maintaining the infrastructure necessary to serve the landfills.

In 1989, San Jose changed the method it used to impose a business tax on the landfills. Whereas the previous tax had been calculated on the basis of volume, the new tax was calculated on a per ton basis. The new tax was set at $2.10 and $3 per ton.

On June 23, 1992, San Jose adopted the ordinance which is at issue in the present appeal. Designated the disposal facility tax ordinance, the measure raised the tax on those who operate landfills in San Jose to $13 per ton.[1] The purpose of the ordinance was to raise general fund revenue in order to close a predicted $20 million budget deficit, and to support urban services in San Jose. The ordinance was not intended for regulation and was adopted only after San Jose considered a number of revenue raising alternatives.

The landfill operators affected by the ordinance had the option of absorbing the increase in the disposal facility tax. They elected not to do so and, instead, passed the increase on to their customers in the form of higher disposal rates.

San Jose disposes of its solid waste at landfills which are affected by the tax, so San Jose pays the same increased rates as any other landfill user. Although San Jose discussed passing the increased cost of disposal on to its residents in the form of higher garbage collection rates, it ultimately decided not to do so.

---

[1]The ordinance states in relevant part, "Beginning July 1, 1992, every person engaged in the business of operating a solid waste disposal facility shall pay a monthly disposal facility tax in the amount of Thirteen Dollars ($13.00) for each ton of solid waste accepted by the facility site during the month."

Appellants in this action are 10 cities that are located near San Jose and that dispose of all or part of their solid waste in landfills located in San Jose.[2] Like San Jose, each appellant has the authority to set garbage rates paid by its respective residents, and each has the legal authority to absorb the increased costs rather than raise garbage collection rates. However, unlike San Jose, each appellant decided to pass on the increased disposal costs to its respective residents. As a result, residents in the appellant cities currently pay higher disposal rates.

In July 1992, appellants filed a petition for writ of mandate and complaint for injunctive relief in the Santa Clara Superior Court challenging San Jose's decision to increase its waste disposal tax. While appellants alleged four causes of action, only one is relevant on this appeal. Appellants claimed that San Jose had violated the principles set forth in *Livermore* because it had failed to "act in accordance with the regional welfare" when enacting the increase.[3] The result of San Jose's action, appellants alleged, would be an increase in illegal dumping in the region and consequential environmental degradation.

The parties stipulated to a change of venue to the San Mateo Superior Court, and San Jose filed a demurrer to the regional welfare cause of action. The trial court sustained the demurrer ruling the regional welfare limitation recognized in *Livermore* was not applicable to a city's decision to increase a tax. After the remaining causes of action were either rejected or abandoned,[4] appellants filed the present appeal limited to whether the trial court properly sustained the demurrer to the regional welfare cause of action.

## II. DISCUSSION

Before we can reach the merits of this case, we must address a threshold issue. San Jose contends that appellants lack standing to pursue this suit

---

[2]Appellants are the City of Cupertino, the City of Campbell, the City of Los Altos, the Town of Los Altos Hills, the Town of Los Gatos, the City of Milpitas, the City of Mountain View, the City of Santa Clara, the City of Saratoga, and the City of Sunnyvale. We will refer to these municipalities collectively as appellants.

[3]In addition to the alleged violation of *Livermore*'s regional welfare principles, appellants claimed that San Jose violated the California Environmental Quality Act (CEQA) by failing to prepare an environmental impact report; that the tax increase was preempted by the California Integrated Waste Management Act; and that San Jose's ordinance violated the equal protection clauses of the federal and state Constitutions.

[4]The trial court overruled San Jose's demurrer to the cause of action alleging preemption under the California Integrated Waste Management Act; however, appellants subsequently abandoned that line of attack. The court refused to issue a writ based on the alleged CEQA violation because it concluded the tax increase was not a "project" within the meaning of the CEQA statutes. The court ruled the equal protection allegations were meritless because San Jose's tax treated all persons equally.

because the business tax is not imposed on them directly but on the persons who operate the landfills. While San Jose concedes appellants ultimately pay the tax because the landfill operators pass it on to them in the form of higher rates, it contends appellants' interest in the tax is too attenuated to give them standing.

We need not decide this issue directly. ■ The pivotal issue in standing is whether a party has sufficient interest in the issues to ensure the suit will be pursued vigorously. (*Killian* v. *Millard* (1991) 228 Cal.App.3d 1601, 1605 [279 Cal.Rptr. 877].) Here, at least one of the appellants (Sunnyvale) is contractually obligated to pay the tax and, thus, has reason to litigate vigorously. Given this situation, we will assume appellants have standing and proceed to the merits.

■ The primary issue in this case is whether the trial court properly applied the principles articulated by our Supreme Court in *Livermore*. Given this focus, we begin with an analysis of that case.

In *Livermore,* the court reviewed the validity of a municipal land-use ordinance that imposed a moratorium on the issuance of residential building permits until specified educational, sewage treatment, and water supply standards were met. The plaintiffs, an association of contractors and individuals who were interested in residential construction in Livermore, challenged the ordinance arguing it exceeded the authority conferred upon the city under the police power. The court resolved this argument by first reaffirming the standard it had established in prior cases: A local land-use ordinance is valid under the police power if it is "reasonably related to the public welfare." (*Livermore, supra*, 18 Cal.3d at p. 607.) However the court then went on to refine this standard: "Most previous decisions applying this test . . . have involved ordinances without substantial effect beyond the municipal boundaries. The present ordinance, in contrast, significantly affects the interests of nonresidents who are not represented in the city legislative body and cannot vote on a city initiative. We therefore believe it desirable for the guidance of the trial court to clarify the application of the traditional police power test to an ordinance which significantly affects nonresidents of the municipality. [¶] When we inquire whether an ordinance reasonably relates to the public welfare, inquiry should begin by asking *whose* welfare must the ordinance serve. In past cases, when discussing ordinances without significant effect beyond the municipal boundaries, we have been content to assume that the ordinance need only reasonably relate to the welfare of the enacting municipality and its residents. But municipalities are not isolated islands remote from the needs and problems of the area in which they are located; thus an ordinance, superficially reasonable from the limited viewpoint of the municipality, may be disclosed as unreasonable when viewed

from a larger perspective. [¶] These considerations impel us to the conclusion that the proper constitutional test is one which inquires whether the ordinance reasonably relates to the welfare of those whom it significantly affects. If its impact is limited to the city boundaries, the inquiry may be limited accordingly; if, as alleged here, the ordinance may strongly influence the supply and distribution of housing for an entire metropolitan region, judicial inquiry must consider the welfare of that region." (*Ibid.*, italics in original.)

In the years following *Livermore,* courts applied the regional welfare test to determine the validity of a variety of land use ordinances. For example, in *City of Del Mar* v. *City of San Diego* (1982) 133 Cal.App.3d 401, 407-415 [183 Cal.Rptr. 898], the court ruled that San Diego's approval of a new residential community was a valid exercise of the police power because San Diego had considered the general welfare of the entire region when making its decision. In *Northwood Homes, Inc.* v. *Town of Moraga* (1989) 216 Cal.App.3d 1197, 1201-1204 [265 Cal.Rptr. 363], the court ruled that Moraga's enactment of an "open space" ordinance was valid under the police power because the ordinance did not have a regional impact. In *Arnel Development Co.* v. *City of Costa Mesa* (1981) 126 Cal.App.3d 330, 334-340 [178 Cal.Rptr. 723], the court ruled a voter-adopted initiative that rezoned certain property to prevent the construction of moderate income housing was invalid under *Livermore,* because it was not reasonably related to the regional public welfare.

Appellants now seek to apply the principles developed in *Livermore* and its progeny in a different and unprecedented context. While acknowledging that all previous cases have discussed the regional welfare doctrine as a limit on a city's ability to make land use decisions under the police power, appellants suggest this was an "historical accident." They contend there is no reason not to apply those same principles to limit a city's ability to modify a business tax. We disagree.

The Supreme Court developed the regional welfare doctrine specifically to limit a city's ability to act under its police power. The *Livermore* court could not have stated this fact more clearly: "We deal here with a case in which a land use ordinance is challenged *solely on the ground that it assertedly exceeds the municipality's authority under the police power* . . . . For the guidance of the trial court we point out that if a restriction significantly affects residents of surrounding communities, the constitutionality of the restriction must be measured by its impact not only upon the welfare of the enacting community, but upon the welfare of the surrounding region." (*Livermore, supra,* 18 Cal.3d at p. 601, italics added.) Thus, prior cases have

applied the doctrine only to evaluate the validity of land-use regulations enacted under the police power because the doctrine was designed for that purpose. It was not an "accident," historical or otherwise.

Furthermore, there are significant reasons why the regional welfare test should not be used to evaluate San Jose's decision to increase its business tax. First, the police power and the power to tax are markedly different. A charter city, such as San Jose, has the authority to tax under the "municipal affairs" clause of article XI, section 5, subdivision (a) of the California Constitution.[5] (See *Weekes* v. *City of Oakland* (1978) 21 Cal.3d 386, 392 [146 Cal.Rptr. 558, 579 P.2d 449] (*Weekes*); *Times Mirror Co.* v. *City of Los Angeles* (1987) 192 Cal.App.3d 170, 178 [237 Cal.Rptr. 346].) The power is granted to permit cities to raise revenue for local purposes (*Weekes, supra,* 21 Cal.3d at p. 392), and can be curtailed only by the charter itself or when "in direct and immediate conflict with a state statute or statutory scheme" (*ibid.*; see also *Centex Real Estate Corp.* v. *City of Vallejo* (1993) 19 Cal.App.4th 1358, 1362 [24 Cal.Rptr.2d 48]). ■ The power to enact land-use restrictions, by contrast, is based on police power found in article XI, section 7 of the California Constitution.[6] The purpose of the power is to permit cities to promote the health and safety of their residents (see *Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129, 159-160 [130 Cal.Rptr. 465, 550 P.2d 1001]); and as was explained in *Livermore,* a city's exercise of that power is valid so long as it is reasonably related to the public welfare.

■ Second, the factors which motivated the *Livermore* decision do not apply to the tax modification at issue. In adopting the regional welfare test, the Supreme Court recognized that a city's land-use decisions can have significant effect outside the city's boundaries. For example, the ordinance at issue in *Livermore,* which imposed a moratorium on the issuance of residential building permits, could have forced housing that would otherwise have been built in Livermore into the surrounding communities. Those communities would then have had no alternative but to accept Livermore's share of the regional growth. (See *Livermore, supra,* 18 Cal.3d at p. 607.) San Jose's tax modification has a different effect. The tax is assessed against those who operate landfills in San Jose, so the only persons who pay the tax (given that the operators elected to pass it on to their customers) are those who use the landfills. While appellants currently pay the tax because they use the landfills located in San Jose, they are not necessarily required to do so. If

---

[5]Article XI, section 5, subdivision (a) states, in part, "It shall be competent in any city charter to provide that the city governed thereunder may make and enforce all ordinances and regulations in respect to municipal affairs . . . ."

[6]Article XI, section 7 states, "A county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws."

appellants do not want to pay San Jose's business tax, they can exercise the same right possessed by any other member of a free market society. They can take their business elsewhere. This element of choice is not present in the land-use context.

Third, conditioning the taxing power of a municipality by a "regional welfare" standard would effectively cripple a local taxing entity's fiscal responsibility to assess and raise required operating revenue for the use of its citizens in a financially sound and timely manner. Financial chaos could result from thereby allowing outside interference in local revenue raising decisions. The result would be delay and obstruction in necessary local revenue gathering, while awaiting a legal determination, on any number of hypotheses one could conceive, that the tax locally imposed does or does not impact "the region" of which the taxing municipality is part. No court has adopted such a contention in this state, and *Livermore* does not so require or suggest. We, thus, reject appellants' contention that municipal actions taken under these separate constitutional powers must be commonly evaluated by their effect on the "regional welfare."

The fact that at least one of the appellants (Sunnyvale) has entered into a long-term contract which requires that its waste be taken to San Jose does not change this conclusion. Nothing in the record suggests Sunnyvale was required to execute a contract with that provision. Indeed, the parties stipulated that Sunnyvale owns and operates a landfill located within its jurisdiction; and that the Pacheco Pass landfill, located in southern Santa Clara County, has unused capacity. In any event, our evaluation of San Jose's ordinance must be guided by constitutional and statutory principles, not by whether one of the appellants voluntarily entered into a contract which, in hindsight, might not be a good deal.[7]

Appellants' alternate efforts to challenge San Jose's ordinance are equally unpersuasive. They cite *City of Los Angeles* v. *Shell Oil Co.* (1971) 4 Cal.3d 108 [93 Cal.Rptr. 1, 480 P.2d 953] (*Shell Oil*) and *County of Alameda* v. *City and County of San Francisco* (1971) 19 Cal.App.3d 750 [97 Cal.Rptr. 175, 48 A.L.R.3d 332] (*Alameda*) as meaning that a city cannot enact a tax that has an extraterritorial effect, and they suggest similar considerations should limit San Jose's business tax. However, those cases were based on issues which are not present here. In *Shell Oil*, the court simply ruled that a city's business tax must be fairly apportioned to the quantum of business actually

---

[7]Sunnyvale apparently anticipated that San Jose might increase its business tax. Under the contract, Sunnyvale agreed to pay the business tax (then $3 per ton) and any "increases" which might thereafter be imposed. By paying the increased tax, Sunnyvale is simply complying with its contractual obligations.

done within the taxing jurisdiction. (*Shell Oil, supra,* 4 Cal.3d at p. 124.) In *Alameda,* the court merely ruled that San Francisco's attempt to impose a commuter tax solely on residents who lived in other counties violated equal protection principles. (*Alameda, supra,* 19 Cal.App.3d at pp. 756-757.) The San Jose tax is based solely on activity occurring in San Jose, and appellants do not contend on appeal that the San Jose ordinance violates their equal protection rights.

Appellants also suggest that if San Jose's business tax is valid, nothing would prevent a city like San Jose from imposing a construction tax which is so large that it would force development into other jurisdictions and thus achieve the same result decried in *Livermore.* Whatever force this argument may carry in another case, it is not controlling here. Appellants stipulated that the purpose of San Jose's business tax was to raise general fund revenue and that the ordinance was not intended for regulation. The resolution of appellants' argument must await another day.

We conclude the trial court correctly ruled that San Jose's modification of its business tax could not be challenged under the *Livermore* principles.

III. DISPOSITION

The judgment is affirmed.

San Jose's request that we impose sanctions against appellants because they filed an allegedly frivolous appeal is denied.

Costs are awarded to San Jose.

King, J., and Haning, J., concurred.